**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HEALY CONSTRUCTION SERVICES, INC., )
KATHY HEALY, and JAMES HEALY, )
)
Plaintiffs, )
)
v. )     FILED: APRIL 10 , 2008
)     08CV2045     AEE
BRYAN CAVE LLP, )     JUDGE ANDERSEN
)     MAGISTRATE JUDGE VALDEZ
Defendants. )
)

## COMPLAINT

Plaintiffs, Healy Construction Services, Inc., Kathy Healy, and James Healy, by their attorneys, David S. Argentar and Kendall E. Woods, for their Complaint against defendant, Bryan Cave LLP state as follows:

<u>Nature of the Case</u>

1.      After Plaintiffs invested in an investment plan involving market linked deposits, they retained and sought advice from Bryan Cave regarding the proper tax treatment of the investment. Bryan Cave provided a written tax opinion regarding the proper treatment of plaintiffs' investment, and in reliance on that advice, plaintiffs filed their 2001 federal tax return. However, the IRS thereafter deemed the plaintiffs' tax return deficient, held that the tax treatment recommended by Bryan Cave was improper, required the Plaintiffs to pay back taxes that it deemed appropriate and charged plaintiffs a penalty and interest regarding their tax treatment of the investment funds. As a result of Bryan Cave's professional negligence in providing legal advice that created additional liability and financial penalties, Plaintiffs have suffered damages and Bryan Cave has been unjustly enriched. Plaintiffs are seeking to recover their losses against Bryan Cave for professional negligence and fees paid to Bryan Cave.

## The Parties

2.      Plaintiff Healy Construction Services, Inc. ("HCS") is an S corporation organized under the laws of the State of Illinois, with its principal place of business in Illinois.

3.      Plaintiff Kathy Healy was the 100% owner of HCS and is a resident of the State of Illinois.

4.      Plaintiff James Healy is Kathy Healy's husband and is a resident of the State of Illinois.

5.      Defendant Bryan Cave ("Bryan Cave") is a LLP organized under the laws of the State of Missouri, with its principal place of business in St. Louis, Missouri.

## Jurisdiction

6.      Subject matter jurisdiction is proper in this case pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties.

## Venue

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) as a substantial part of the events giving rise to the claim occurred in this district.

## Background

8.      On or about December 1, 2001, HSC invested in an investment plan involving market linked deposits ("MLDs").

9.      Plaintiffs subsequently sought a legal opinion regarding the tax treatment of income/loss as a result of this investment.  Plaintiffs retained the law firm of Bryan Cave LLP on or about April 10, 2002 and paid it $50,000 to provide an opinion letter regarding the proper tax treatment for the investments plaintiffs made pursuant to the plan.

10.      Pursuant to its engagement, Bryan Cave attorney Elizabeth A. Smith sent Plaintiff an opinion letter dated May 17, 2002.  In that letter, Bryan Cave LLP opined that:

A.    The MLDs should be treated as debt instruments for U.S. federal income tax purposes with a contingent interest component that would not be includable in income under section 1275 until the contingency is satisfied.

B.    The contingent interest obligation under the short MLD position should not be a liability within the meaning of section 752.

C.    The Investor's tax basis in the interest in the LLC should be equal to the cash contributed plus the purchase price for the long MLD position, without adjustment resulting from the contribution of the short MLD position.

D.    The maturity of the short MLD position should not result in a deemed distribution to the Investor for U.S. federal income tax purposes and the provisions of section 705(a)(2)(B) should not apply; consequently, there should be no adjustment to the Investor's adjusted basis in the LLC as a result of the maturity of the MLDs.

E.    As a result of the liquidation of the LLC, the Investor will take a tax basis in the Investor's share of the LLC's remaining assets (*i.e.,* the Options) equal to the tax basis previously held in the Investor's LLC interest, reduced by the cash received, if any.

F.    A sale of the Options by Margate LLC will likely result in ordinary gain or loss, measured by the difference between the amount realized on the sale and Margate LLC's adjusted tax basis of the Options, and to the extent a loss resulted from the sale of the Options by Margate LLC, such loss is allocable to the Investor pursuant to section 704(c).

G.    Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions should be upheld if challenged by the Service.

H.    Based upon the foregoing, the Service should not be successful were it to assert a penalty against the Investor under section 6662(b)(2) or (3) for positions taken on the Investor's federal S corporation income tax return with respect to the Transactions.

(See Bryan Cave LLP opinion letter ("Opinion Letter") attached hereto as Exhibit A.)

11.    After receipt of the Opinion Letter, and in reliance on the legal advice and opinions contained therein, Plaintiffs filed their 2001 federal income tax returns treating their MLD investments in the manner recommended by Bryan Cave.

12.    Thereafter, Plaintiffs were advised by the IRS that their tax returns were deficient and that the tax treatment of the investment recommended by Bryan Cave and followed by plaintiffs was improper.

13.    On July 27, 2006, plaintiffs were required to pay to the IRS taxes in the amount of $784,128 due to the IRS disallowing certain claimed deductions plaintiff made based on the Opinion Letter.  Furthermore, as a result of having treated their MLD investment in the manner recommended by Bryan Cave, the IRS imposed and the Plaintiffs were required to pay a penalty to the IRS in the amount of $312,651 and interest in the amount of $189,245.59.

## Count I

### (Legal Malpractice)

14.    Plaintiffs adopt and reallege the allegations of paragraphs 1 through 13 as though fully set forth herein.

15.    Bryan Cave entered into an attorney-client relationship with Plaintiffs and pursuant to that relationship provided legal advice and opinions regarding proper tax treatment of funds relating to the MLD investment plan.  (Exhibit A).

16.    Based on the attorney-client relationship, Bryan Cave had a duty to plaintiffs to provide accurate information regarding the proper and permitted tax treatment of funds relating to the MLD investment.

17.    Bryan Cave breached this duty by rendering an opinion with erroneous legal advice.

18.    Plaintiffs relied upon the Opinion Letter provided by Bryan Cave in their tax treatment of funds relating to the MLD investment strategy on their 2001 federal income tax returns.

19.    As a direct result of their reliance on Bryan Cave's erroneous legal advice and Bryan Cave's breach of duty as aforesaid, Plaintiffs incurred damages consisting of $312,651 in penalties and $189,245.59 in interest charged by the IRS, which Plaintiffs have paid.

WHEREFORE, Plaintiffs pray for judgment in their favor and against the defendant, Bryan Cave LLP in the amount of $501,896.59, for the costs of this action, interest, and for such other and further relief as this Court deems just and proper.

### Count II

(Unjust Enrichment)

20.    Plaintiffs adopt and reallege the allegations of paragraphs 1 through 13 as though fully set forth herein.

21.    Plaintiffs retained Bryan Cave to issue an opinion regarding the proper tax treatment for their investments.

22.    Plaintiffs paid Bryan Cave $50,000 for said tax opinion.

23.    Bryan Cave issued a tax opinion to Plaintiffs setting forth its advice on how to handle the tax treatment for Plaintiffs MLD investment.

24.    Plaintiffs followed the advice of Bryan Cave with its preparation of its 2001 federal income tax returns.  Thereafter the IRS determined that the treatment recommended by Bryan Cave and relied upon by Plaintiffs was improper and resulted in the imposition of penalties and other costs to Plaintiffs.

25.    Bryan Cave has been paid $50,000 for legal advice and opinions that not only were erroneous and of no value, but also resulted in significant additional liabilities to Plaintiffs.

26.    Bryan Cave has been unjustly enriched by its receipt of the fees paid by Plaintiffs and it would be unjust and inequitable for Bryan Cave to retain those sums.

WHEREFORE, Plaintiffs prays for judgment in their favor and against the defendant, Bryan Cave LLP in the amount of $50,000, for the costs of this action, interest, and for such other and further relief as this Court deems just and proper.

### Jury Demand

Plaintiff demands a trial by twelve (12) person jury of all claims asserted herein.

HEALY CONSTRUCTION SERVICES, INC.,
KATHY HEALY, AND JAMES HEALY


By   s/ David S. Argentar  
One of Their Attorneys

David S. Argentar (ARDC #6215710)
Kendall E. Woods (ARDC #6278740)
CHUHAK & TECSON, P.C.
30 South Wacker Drive
Suite 2600
Chicago, Illinois  60606-7413
(312) 444-9300

08CV2045   AEE
JUDGE ANDERSEN
MAGISTRATE JUDGE VALDEZ

Exhibit A

# BRYAN CAVE LLP

ST. LOUIS, MISSOURI
WASHINGTON, D.C.
KANSAS CITY, MISSOURI
OVERLAND PARK, KANSAS
PHOENIX, ARIZONA
LOS ANGELES, CALIFORNIA
IRVINE, CALIFORNIA

245 PARK AVENUE
NEW YORK, NEW YORK 10167-0034
(212) 692-1800
FACSIMILE: (212) 692-1900

RIYADH, SAUDI ARABIA
KUWAIT CITY, KUWAIT
ABU DHABI, UNITED ARAB EMIRATES
DUBAI, UNITED ARAB EMIRATES
HONG KONG
SHANGHAI, PEOPLE'S REPUBLIC OF CHINA
IN ASSOCIATION WITH BRYAN CAVE,
A MULTINATIONAL PARTNERSHIP.
LONDON, ENGLAND

May 17, 2002

**PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT**

Mr. Philip A. Salvador, Partner
Lancelot Capital, Ltd.
9031 Croyden Lane
Orland Park, Illinois 60462

Re: **Coastal Trading LLC / The Margate Trading Program**

Dear Mr. Salvador:

You, on behalf of the partners of Lancelot Capital, Ltd., have requested our opinion regarding certain United States ("U.S.") federal income tax consequences of the investment transactions (the "Transactions") described below.

In rendering our opinion, we have reviewed representations and advice, including financial information, from various parties to the Transactions and made certain assumptions, which representations, advice and assumptions are referred to herein. We have also examined such documents (see list of documents below), and we have made such other inquiries of officers, owners and representatives of the entities involved in the Transactions as we have considered necessary to render the opinions set forth herein. We have made no independent verification of such representations, advice, assumptions, documents, and responses to such

May 17, 2002
Page 2

inquiries. If any such item is inaccurate in any material respect, or any such documents prove not to be authentic, the opinions contained herein may not be relied upon. We have reviewed the applicable provisions of the Internal Revenue Code of 1986, as amended,[1] and of the final, temporary, and proposed Treasury Regulations promulgated thereunder; relevant decisions of the federal courts; published Revenue Rulings ("Rev. Rul.") and Revenue Procedures ("Rev. Proc.") of the Internal Revenue Service (the "Service"); and such other materials as we have considered relevant. In certain instances we have determined that there is no authority directly on point, and in such instances we have reached our opinion reasoning from such other authority as we believe to be relevant to the issues addressed. We also point out that our opinions are not binding upon the Service or the courts.

Based upon our understanding of the facts and assumptions as described herein, it is our opinion that it is more likely than not that the conclusions set forth in the "Opinions" discussion set forth below would be upheld by a court if they were challenged by the Service and fully litigated on the merits. Any conclusion set forth in this letter that an issue "should," "would," "will" or "likely" be resolved in a particular manner means only that it is our opinion it is more likely than not that a court would sustain that conclusion.

---

[1] Unless otherwise noted, all "section" references are to the Internal Revenue Code of 1986, as amended and in effect (the "Code"), and all "Regulations" and "Treas. Reg." references are to the Treasury Department's regulations promulgated under the Code.

May 17, 2002
Page 3

BRYAN CAVE LLP

## I.    THE TRANSACTIONS

### A.    The Program

We understand that Coastal Trading LLC ("Coastal"), an investment manager that specializes in non-correlated investments, including market linked deposits ("MLDs")[2] and leveraged hedge funds, sought to expand its investor base.  It is also our understanding that in order to encourage new and existing investors to commit substantial funds to its existing five-year investment program, Coastal offered a short-term arrangement on an introductory or trial basis to individual investors at investment levels lower than Coastal's normal minimum level of investment.  During this trial period, Coastal was permitted to leverage the investments (typically hedge funds) up to one-and-one-half times the investors' cash contribution (rather than its normal leverage authority of up to four times the investors' cash contribution).  This trial period was intended to provide investors with a greater understanding of, and comfort with, the types of investments Coastal utilizes before committing funds for an extended period of time.  If Coastal produced a profit for an investor during this trial period (profit defined generally as the net realized profit and loss during the trial period on the non-MLD assets plus the change in net unrealized profit and loss on open positions during the trial period on the non-MLD assets, less

---

[2]  An MLD, generally, is a cash deposit with two interest components — a fixed rate of return which is paid in all events at the end of the term for the cash deposit, and a contingent rate of return which is tied to the performance of a market item (such as foreign currency).  Thus, the obligation of the counterparty to pay the contingent interest component of the MLD is therefore determined by reference to a specific financial market measure, such as the value or price of an equity index or a commodity, or to a change in foreign currency exchange rates, and such determination is made at the expiration date set for the deposit.  An MLD can be either bought as a long position or sold as a short position.  In general, the cost of purchasing a long MLD position is influenced by the overall rate of return, and the probability of obtaining that return, that the investor is seeking.  For short-term MLDs, the maturity date is usually less than one year (typically 10, 15, 30, 45 or 90 days).  Long and short MLDs are separate instruments that can be bought or sold separately.

**BRYAN CAVE LLP**

all brokerage commissions, transaction fees, management fees and other fees and charges paid or accrued during the trial period), the investor was obligated to subscribe to a specified Coastal investment fund for a minimum period of five years (with significant early withdrawal penalties).

We understand that to facilitate this initial trial investment, at Coastal's direction, an investor subscribed to The Margate Trading Program (the "Program") by executing a subscription agreement (the "Subscription Agreement") and simultaneously opened an account (the "Account") with Deutsche Banc Alex. Brown LLC ("Alex Brown") in order to utilize Coastal's investment strategy, which included purchasing specified long and short MLD positions, and trading, buying, selling, and otherwise acquiring, holding, disposing of, and dealing in, on margin or otherwise, various types of other financial products (the "Investment Strategy"). The investor also executed a discretionary limited power-of-attorney giving Coastal discretionary trading authority over the Account, and Coastal managed the Account while other investors for the Program were identified. Coastal has advised us that because some investors were concerned over liability exposure with respect to the leverage feature (as described above, up to one-and-one-half times the investors' cash contributions), Coastal offered investors the opportunity to assign the cash and long and short MLDs in their Accounts to a newly created Delaware limited liability company (the "Delaware LLC"). Investors who chose to assign their assets to the Delaware LLC executed an assignment agreement (the "Assignment Agreement") on the transfer date (the "Transfer Date"). The investment account of the Delaware LLC (the "Delaware LLC Account") aggregated the assets and liabilities of the various investors' Accounts, and the investors who elected to utilize the Delaware LLC to hold their investments

May 17, 2002
Page 5

owned in the aggregate 100% of the Delaware LLC interests.  The Delaware LLC Account

served as the "test account" for the purpose of determining whether Coastal produced a profit for

the investor and thus whether the investor was obligated to commit to a long-term investment

with Coastal.  In addition, we understand that the Delaware LLC Account permitted more

effective use of the investment base by Coastal during the trial period.  We have been advised

that during the test period, the Delaware LLC entered into new long and short MLD positions,

leveraged hedge funds, foreign currency contracts, and other investments.  The initial

contributions of the investors' long and short MLDs were structured so that there would not be

diversification (from a U.S. federal income tax perspective) on the initial contribution and

formation of the Delaware LLC.  Coastal served as the investment manager of the Delaware

LLC, and provided investment information to the investors demonstrating that, with Coastal's

Investment Strategy, there was a reasonable possibility that the Delaware LLC could make a

significant short-term pre-tax profit with respect to the investments.  We understand that the U.S.

dollar was the functional currency of the investors and the Delaware LLC.

          The Delaware LLC Account operated as a "test account" for a period of at least

thirty days and no more than sixty days from the Transfer Date (the "Test Period").  After the end

of the Test Period, the Delaware LLC liquidated and distributed its assets and liabilities to each

of its members' Accounts in accordance with their membership ownership interest.  If the non-

MLD investments during the Test Period were profitable (profitable defined generally as the net

realized profit and loss during the trial period on the non-MLD assets plus the change in net

unrealized profit and loss on open positions during the trial period on the non-MLD assets, less

May 17, 2002
Page 6

### BRYAN CAVE LLP

all brokerage commissions, transaction fees, management fees and other fees and charges paid or

accrued during the trial period), the investors were obligated to invest the liquidation proceeds

for a minimum five-year period with The Margate Trading Fund, LLC (the "Fund" or "Margate

LLC"). While a withdrawal during the initial year was prohibited, withdrawals after the first

year would be allowed but would be subject to substantial early withdrawal penalty that

decreased over time until the end of the five-year period. If the non-MLD investment return

during the Test Period were negative, the investors had the option (but not the obligation) to

contribute the liquidation proceeds to the Fund. We understand that the consolidation of

investments into the Fund provided an investment level with more advantageous purchasing

power, as well as reduced transaction commissions and administrative costs due to the size of the

collective investments. The Fund intends to utilize the Investment Strategy (as described above),

and is expected to continue to make investments in MLDs, as well as leveraged investments in

hedge funds, foreign currency contracts, and investments in other strategies that will provide the

investors with a potential for significant economic gain over the five-year life of the Fund. In

addition, we understand that the Fund has invested in a diversified portfolio on the

recommendation of various commodity trading advisors, foreign exchange traders, and securities

traders (the "Advisors"). Coastal allocated the Fund's assets to a select group of Advisors such

that no single Advisor has more than a 33-1/3% allocation of the Fund's assets. In order to reach

its normal minimum investment size, as well as to maximize the potential return to the investors,

Coastal has been authorized to leverage up to four times the investors' cash contributions to the

Fund.

May 17, 2002
Page 7

**BRYAN CAVE LLP**

### B.    Creation of Initial Account

#### 1.    Kathy J. Healy

We understand that on December 1, 2001, Kathy J. Healy ("Healy"), executed a

Subscription Agreement for purposes of participating in the Program, and that Healy opened an

account with Alex Brown in accordance with the Program with an initial cash deposit of

$330,000. This Alex Brown account was established to introduce Healy to Coastal's trading

strategy. As noted above, we understand that Coastal, as manager of the account, intended for

Healy to enter into long and short MLD positions, and trade, buy, sell, and otherwise acquire,

hold, dispose of, and deal in, on margin or otherwise (through the use of leverage), various types

of financial products. Coastal leveraged Healy's account at approximately one-and-one-half

times the cash contribution in the account. *See* Representations of Coastal, dated May 6, 2002.

Pursuant to the advice of Coastal, we understand that Healy purchased a long

MLD on December 3, 2001, for a term of approximately 30 days. This long MLD position

constituted a deposit of EUR[3/] 22,471,910 (the "Long Deposit Amount") by Healy with Deutsche

Bank AG, London Branch ("DB" or the "Counterparty"). The premium paid by Healy was

EUR 2,247,191, and was paid on December 7, 2001 (the "Long Bonus Premium Payment

Date"). Under the terms of the long MLD position, on December 28, 2001 (the "Long Maturity

Date") the Counterparty would be required to pay Healy an amount equal to the sum of: (i) the

"Long Redemption Amount" (as defined below), and (ii) the "Long Bonus Coupon" (as defined

below), *if* at 10:00 a.m. New York time on December 27, 2001 (the "Long Bonus Coupon Fixing

---

[3/]    Unless otherwise noted, all "EUR" references are to the Euro.

**BRYAN CAVE LLP**

May 17, 2002
Page 8

Date"), the spot market USD/EUR[4/] exchange rate was at least .8680 (the "Long Bonus Level").

For purposes of the foregoing, the "Long Redemption Amount" means the Long Deposit

Amount plus interest calculated from the date of deposit of the Long Deposit Amount to the

Long Maturity Date at an annual rate of 3.60%. The "Long Bonus Coupon" means an amount

equal to the product of: (i) 16%, and (ii) the Long Deposit Amount. If the Euro were not trading

at or above the Long Bonus Level on the Long Bonus Coupon Fixing Date, then Healy would be

entitled only to the return of the Long Redemption Amount.

Healy also sold a short MLD on December 3, 2001, for a term of approximately

30 days. This short MLD position constituted a deposit of EUR 22,471,910 (the "Short Deposit

Amount") made by the Counterparty with Healy. The premium paid by the Counterparty for the

short MLD position was EUR 2,222,472, and was paid on December 7, 2001 (the "Short Bonus

Premium Payment Date"). Under the terms of the short MLD position, on December 28, 2001

(the "Short Maturity Date") the Counterparty would be entitled to an amount equal to the sum of:

(i) the "Short Redemption Amount" (as defined below), and (ii) the "Short Bonus Coupon" (as

defined below), *if* at 10:00 a.m. New York time on December 27, 2001 (the "Short Bonus

Coupon Fixing Date"), the spot market USD/EUR exchange rate was at least equal to .8678 (the

"Short Bonus Level"). For purposes of the foregoing, the "Short Redemption Amount" means

the Short Deposit Amount plus interest calculated from the date of deposit of the Short Deposit

Amount to the Short Maturity Date at an annual rate of 3.60%. The "Short Bonus Coupon"

means an amount equal to the product of: (i) 15.824%, and (ii) the Short Deposit Amount. If the

---

[4/]    Unless otherwise noted, all "USD" references are to the U.S. dollar.

### BRYAN CAVE LLP

Euro were not trading at or above the Short Bonus Level on the Short Bonus Coupon Fixing Date, then the Counterparty would be entitled only to the return of the Short Redemption Amount.

The Counterparty provided a confirmation for each "Market Linked Deposit Transaction" (the "Confirmation," or collectively, the "Confirmations") which set forth the terms and conditions with respect to the long MLD and short MLD entered into by Healy. We understand that the MLDs held by Healy had a probability of approximately 28% of reaching the threshold prices. *See* Representations of Coastal, dated May 6, 2002.

### 2.    Philip A. Salvador

We understand that on December 1, 2001, Philip A. Salvador ("Salvador") (Healy and Salvador together, the "Participants"), executed a Subscription Agreement for purposes of participating in the Program, and that Salvador opened an account with Alex Brown in accordance with the Program with an initial cash deposit of $82,500. This Alex Brown account was established to introduce Salvador to Coastal's trading strategy. As noted above, we understand that Coastal, as manager of the account, intended for Salvador to enter into long and short MLD positions, and trade, buy, sell, and otherwise acquire, hold, dispose of, and deal in, on margin or otherwise (through the use of leverage), various types of financial products. Coastal leveraged Salvador's account at approximately one-and-one-half times the cash contribution in the account. *See* Representations of Coastal, dated May 6, 2002.

Pursuant to the advice of Coastal, we understand that Salvador purchased a long MLD on December 3, 2001, for a term of approximately 30 days. This long MLD position

**BRYAN CAVE LLP**

May 17, 2002
Page 10

constituted a deposit of EUR 5,617,978 (the "Long Deposit Amount") by Salvador with

Deutsche Bank AG, London Branch ("DB" or the "Counterparty"). The premium paid by

Salvador was EUR 561,798, and was paid on December 7, 2001 (the "Long Bonus Premium

Payment Date"). Under the terms of the long MLD position, on December 28, 2001 (the "Long

Maturity Date") the Counterparty would be required to pay Salvador an amount equal to the sum

of: (i) the "Long Redemption Amount" (as defined below), and (ii) the "Long Bonus Coupon"

(as defined below), *if* at 10:00 a.m. New York time on December 27, 2001 (the "Long Bonus

Coupon Fixing Date"), the spot market USD/EUR exchange rate was at least .8680 (the "Long

Bonus Level"). For purposes of the foregoing, the "Long Redemption Amount" means the Long

Deposit Amount plus interest calculated from the date of deposit of the Long Deposit Amount to

the Long Maturity Date at an annual rate of 3.60%. The "Long Bonus Coupon" means an

amount equal to the product of: (i) 16%, and (ii) the Long Deposit Amount. If the Euro were not

trading at or above the Long Bonus Level on the Long Bonus Coupon Fixing Date, then Salvador

would be entitled only to the return of the Long Redemption Amount.

Salvador also sold a short MLD on December 3, 2001, for a term of

approximately 30 days. This short MLD position constituted a deposit of EUR 5,617,978 (the

"Short Deposit Amount") made by the Counterparty with Salvador. The premium paid by the

Counterparty for the short MLD position was EUR 555,618, and was paid on December 7, 2001

(the "Short Bonus Premium Payment Date"). Under the terms of the short MLD position, on

December 28, 2001 (the "Short Maturity Date") the Counterparty would be entitled to an amount

equal to the sum of: (i) the "Short Redemption Amount" (as defined below), and (ii) the "Short

May 17, 2002
Page 11

Bonus Coupon" (as defined below), *if* at 10:00 a.m. New York time on December 27, 2001 (the

"Short Bonus Coupon Fixing Date"), the spot market USD/EUR exchange rate was at least equal

to .8678 (the "Short Bonus Level"). For purposes of the foregoing, the "Short Redemption

Amount" means the Short Deposit Amount plus interest calculated from the date of deposit of

the Short Deposit Amount to the Short Maturity Date at an annual rate of 3.60%. The "Short

Bonus Coupon" means an amount equal to the product of: (i) 15.824%, and (ii) the Short

Deposit Amount. If the Euro were not trading at or above the Short Bonus Level on the Short

Bonus Coupon Fixing Date, then the Counterparty would be entitled only to the return of the

Short Redemption Amount.

      The Counterparty provided a confirmation for each "Market Linked Deposit

Transaction" (the "Confirmation," or collectively, the "Confirmations") which set forth the terms

and conditions with respect to the long MLD and short MLD entered into by Salvador. We

understand that the MLDs held by Salvador had a probability of approximately 28% of reaching

the threshold prices. *See* Representations of Coastal, dated May 6, 2002.

     **C.**    **Contribution of Assets to November X Investments, LLC**

      During the Test Period, we understand that Coastal advised the Participants that

the liability exposure of the Participants' initial investments could be limited, and the

Participants could have the potential for more advantageous investment opportunities, by

assigning cash and the Participants' respective MLD positions along with other investors to

November X Investments, LLC, a newly created Delaware limited liability company (the

"LLC"). Following the advice of Coastal, we understand that each Participant entered into an

May 17, 2002
Page 12

operating agreement for the LLC with Coastal effective as of October 22, 2001 (the "Operating

Agreement") in anticipation of assigning the MLD investments to the LLC in exchange for an

interest in the LLC. On December 6, 2001, each Participant authorized Alex Brown to transfer

the remaining cash in the Participant's Alex Brown account to the LLC as a capital contribution.

Subsequently, on December 6, 2001, each Participant executed an Assignment Agreement with

Deutsche Bank AG (acting through its New York Branch), and the LLC assigning the

Participant's MLD positions to the LLC. In exchange for the Participants' contribution of cash

and the MLD positions to the LLC, the Participants received an aggregate 6,763 Class A Units in

the LLC. By letter dated December 6, 2001, Alex Brown was notified of the assignment of the

Participants' MLD positions to the LLC. Coastal continued to utilize the Investment Strategy

while managing the assets now held by the LLC.

**D.    Contribution of Healy LLC Interest to Healy Construction Services, Inc.**

It is our understanding that on December 7, 2001, Healy entered into an

Assignment Agreement assigning the interest in the LLC to Healy Construction Services, Inc.,

Healy's wholly owned S corporation (the "S Corp").[5]

---

[5]    Section 1361(a) defines the term S corporation, generally, as a "small business corporation" for which an election under section 1362(a) is in effect for such year. A small business corporation, in turn, is defined by section 1361(b) as a domestic corporation which is not an ineligible corporation, and which does not have (i) more than 75 shareholders, (ii) shareholders who are not individuals (except for estates and certain specified trusts and charitable organizations), (iii) nonresident alien shareholders, and (iv) more than one class of stock. Under sections 1363 and 1366, the S Corp will be treated as a pass-through entity for federal income tax purposes, and as such, items of income, loss, deduction and credit will flow through to Healy for reporting on Healy's federal income tax return.

May 17, 2002
Page 13

**BRYAN CAVE LLP**

### E.    Maturity of MLD Positions and Purchase of Foreign Currency Options by the LLC

It is our understanding that on December 18, 2001, pursuant to the Investment Strategy, the LLC purchased from DB European-style foreign currency options (the interest in the foreign currency options is hereinafter defined as an "Option," or collectively the "Options"). We also understand that as of December 28, 2001, the MLDs originally entered into by the Participants and subsequently transferred to the LLC matured.

### F.    Liquidation of the LLC and Investment in Margate LLC

We understand that the Participants obtained a profit on the non-MLD investments during the Test Period and accordingly were obligated to invest in Margate LLC for a five-year period.  We understand further that on December 27, 2001, an Action by Unanimous Written Consent of the Members of November X Investments, LLC was adopted to dissolve the LLC.  A Certificate of Cancellation for the LLC was filed in the Office of the Secretary of State for the State of Delaware on February 20, 2002.

Upon the liquidation of the LLC and distribution of its assets, Salvador executed an Assignment Agreement assigning thereunder the liquidation proceeds of the LLC which consisted of cash and the Options to Margate LLC in exchange for a 1.05% membership interest in Margate LLC.  Similarly, upon the liquidation of the LLC and distribution of its assets, the S Corp executed an Assignment Agreement assigning thereunder the liquidation proceeds of the LLC which consisted of cash and the Options to Margate LLC in exchange for a 4.21% membership interest in Margate LLC.  Immediately thereafter, Salvador and the S Corp each executed an Assignment Agreement contributing the membership interest in Margate LLC to

## BRYAN CAVE LLP

Lancelot Capital, Ltd., a Nevada limited liability company whose members are the S Corp and

Salvador (the "Partnership") (Participants, the S Corp and the Partnership, individually and

together the "Investor," as the context may require).  We understand that Margate LLC intends to

continue to utilize the Investment Strategy and expects to make investments in MLDs, hedge

funds, foreign currency contracts, and other strategies that have the potential for significant

economic gain.  We understand further that prior to December 31, 2001, Margate LLC

terminated some or all of the Options and invested the proceeds with several Advisors, including

HP Falconer, Legg Mason, James River and Lone Star.

### Documentation Reviewed by Us

1.  The Margate Trading Program Private Offering Memorandum, dated August 21, 2001.

2.  The Margate Trading Program Subscription Agreement for each Participant, signed December 1, 2001.

3.  Deutsche Banc Alex. Brown Account Agreement for Kathy J. Healy, dated November 28, 2001.

4.  Deutsche Banc Alex. Brown Account Agreement for Philip A. Salvador, dated November 27, 2001.

5.  Full Trading Authorization from each Participant, dated November 29, 2001.

6.  Letter of Authorization from each Participant to Deutsche Banc Alex. Brown authorizing purchase and sale of MLD positions and transfer of cash to November X Investments, LLC as capital contribution, dated November 28, 2001.

7.  Deutsche Bank AG, London Branch Confirmations for Market Linked Deposit Transactions for each Participant, trade dates December 3, 2001.

8.  Certificate of Formation of November X Investments, LLC, dated October 22, 2001.

9.  Form SS-4, "Application for Employer Identification Number," for November X Investments, LLC.

May 17, 2002
Page 15

10. Operating Agreement for November X Investments, LLC, dated October 22, 2001.

11. Assignment Agreement between each Participant, Deutsche Bank AG, New York Branch, and November X Investments, LLC, dated December 6, 2001.

12. Notice of Assignment Agreement to Deutsche Banc Alex. Brown from each Participant, dated December 6, 2001.

13. Assignment Agreement between Kathy Healy, November X Investments, LLC, Deutsche Bank AG, New York Branch, and Healy Construction Services, dated December 7, 2001.

14. Deutsche Bank AG, London Branch Confirmations for Currency Option Transactions, trade dates December 18, 2001.

15. Deutsche Banc Alex. Brown Account Statement for November X Investments, LLC.

16. Action by Unanimous Written Consent of the Members of November X Investments, LLC consenting to dissolution of November X Investments, LLC, effective as of December 27, 2001.

17. Notice to Deutsche Banc Alex. Brown to liquidate November X Investments, LLC and authorization to transfer assets of November X Investments, LLC to The Margate Trading Fund, LLC, dated December 26, 2001.

18. Certificate of Cancellation of November X Investments, LLC, dated February 20, 2002.

19. Articles of Organization of Lancelot Capital, Ltd., dated December 4, 2001.

20. Limited Liability Company Charter of Lancelot Capital, Ltd., dated December 5, 2001.

21. Assignment Agreement between Kathy Healy as President of Healy Construction Services, Inc. and The Margate Trading Fund, LLC, dated as of December 28, 2001.

22. Assignment Agreement between Philip A. Salvador and The Margate Trading Fund, LLC, dated as of December 28, 2001.

23. Assignment Agreement between Healy Construction Services, Inc., The Margate Trading Fund, LLC and Lancelot Capital, Ltd., dated December 28, 2001.

24. Assignment Agreement between Philip A. Salvador, The Margate Trading Fund, LLC and Lancelot Capital, Ltd., dated December 28, 2001.

**BRYAN CAVE LLP**

25. Deutsche Banc Alex. Brown Account Statement for The Margate Trading Fund, LLC.

26. Limited Liability Company Agreement for Margate Trading Fund, LLC, dated August 6, 2001.

27. Subscription Agreements for The Margate Trading Fund, LLC, dated December 7, 2001.

28. Representations of Coastal Trading LLC.

29. Representations of Kathy J. Healy, individually and as President of Healy Construction Services, Inc.

30. Representations of Philip A. Salvador, individually and as Partner of Lancelot Capital, Ltd.

## II.   ANALYSIS

### A.   Partnership Status of the LLC and Margate LLC

Under sections 701 and 702 of the Code, a partnership is treated as a flow-through entity for U.S. federal income tax purposes. Based on our review of the organizational documents, we have assumed that the LLC and Margate LLC have been validly formed under Delaware law and that neither will make an election to be treated as something other than a partnership for U.S. federal income tax purposes. Therefore, each should be treated a partnership for U.S. federal income tax purposes under Treas. Reg. section 301.7701-3. *See, e.g., Knight v. Comm'r*, 115 T.C. 506 (2000) (upholding validity of a newly formed family limited partnership); *Estate of Albert Strangi v. Comm'r*, 115 T.C. 478 (2000) (upholding validity of a newly formed family limited partnership); *70 Acre Recognition Equipment Partnership v. Comm'r*, 72 T.C.M. (CCH) 1508 (1996) (upholding validity of a partnership). *Compare ASA Investerings Partnership v. Comm'r*, 201 F.3d 505 (D.C. Cir. 2000), *with Boca Investerings Partnership v.*

**BRYAN CAVE LLP**

*United States*, 167 F. Supp. 2d 298 (D.D.C. 2001), *appeal docketed*, No. 01-5429 (D.C. Cir. Feb.

19, 2002) (discussed below).

> In *Estate of Albert Strangi*, the Tax Court stated:

> Taxpayers are generally free to structure transactions as they
> please, even if motivated by tax-avoidance considerations. *See
> Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Yosha v.
> Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988), *aff'g Glass v.
> Commissioner*, 87 T.C. 1087 (1986).

*Strangi*, 115 T.C. at 4423.  The Tax Court then held:

> [The Partnership] was validly formed under State law.  The
> formalities were followed, and the proverbial "i's were dotted"
> and "t's were crossed."  The partnership, as a legal matter,
> changed the relationships between decedent and his heirs and
> decedent and actual and potential creditors.  Regardless of
> subjective intentions, the partnership had sufficient substance to
> be recognized for tax purposes.  Its existence would not be
> disregarded by potential purchasers of decedent's assets, and we
> do not disregard it in this case.

*Id.* at 4424.

In an earlier partnership case, the Supreme Court reasoned that in determining

whether there was a true partnership for income tax purposes, "[t]he question is . . . whether,

considering all the facts — the agreement, the conduct of the parties in execution of its

provisions, their statements, the testimony of disinterested persons, the relationship of the parties,

their respective abilities and capital contributions, the actual control of income and the purposes

for which it is used, and any other facts throwing light on their true intent — the parties in good

faith and acting with a business purpose intended to join together in the present conduct of the

enterprise." *Comm'r v. Culbertson*, 337 U.S. 733, 742 (1949) (footnote omitted).  *See also 70*

**BRYAN CAVE LLP**

*Acre Recognition Equipment*, 72 T.C.M. (CCH) at 1508 (citing language of *Culbertson* as the

inquiry for determining whether a partnership exists); *Sirrine Building No. 1 v. Comm'r*,

69 T.C.M. (CCH) 2476 (1995) (citing language of *Culbertson* as the test for determining whether

an entity is a partnership); *Smith's Estate v. Comm'r*, 313 F.2d 724 (8th Cir. 1963) (declaring

*Culbertson* a landmark case in determining what constitutes a valid partnership for federal tax

purposes); *Luna v. Comm'r*, 42 T.C. 1067 (1964) (citing *Culbertson* as asking essential question

of whether the parties intended to join together).

    The Tax Court applied similar reasoning in *Brannen v. Commissioner*,

78 T.C. 471 (1982), in which neither party raised the issue of whether a valid partnership existed

where there was a lack of profit motive. In a footnote, the Tax Court noted that:

> [[T]he entity] was formed by a formal partnership agreement
> covering the rights and liabilities of the partners, the partnership
> filed returns of income, and books and records were maintained
> on behalf of the partnership. On the basis of this record, it
> appears that [the entity] was a partnership.

*Brannen* at 512 (footnote 16) (citing *Madison Gas & Electric Co. v. Comm'r*, 72 T.C. 521, 558-

63 (1979) and *Luna v. Comm'r*, 42 T.C. at 1077-78).

    In the recent case of *Boca Investerings Partnership v. United States*, *supra*, the

District Court for the District of Columbia referred to the "four basic attributes" of a partnership

outlined by the Tax Court in *S & M Plumbing Co. v. Commissioner*, 55 T.C. 702, 707 (1971), as

the factors to examine in determining whether a partnership exists. These four attributes are: (1)

the express or implied intent of the parties to form a partnership, (2) the contribution of money,

property, and/or services to the partnership by each party, (3) an agreement among the parties for

## BRYAN CAVE LLP

joint proprietorship and control, and (4) an agreement among the parties to share profits. In *Boca Investerings*, the court concluded that because the "four basic attributes" were present, and because there was a legitimate business purpose for the creation of the partnership, it was irrelevant if one of the partners was motivated in part to organize the partnership by a desire to reduce taxes.

Similarly, in this instance, the LLC and Margate LLC should each be respected as a partnership for U.S. federal income tax purposes because the basic attributes of a partnership as outlined in *Boca Investerings* were present here, and like those cases noted above the investors should be viewed as having joined together in good faith with a common investment purpose.

### B.    Business Purpose and Economic Substance Sham Transaction Doctrines

The Service has attempted to disallow the tax consequences which result from the formation and operation of a partnership where the Service believes that such partnership was not formed with the requisite business purposes, or where separate and apart from the tax benefits, economic substance to the transaction is lacking. In the case of *Salina Partnership LP v. Commissioner*, 80 T.C.M. (CCH) 686 (2000), the Tax Court summarized the economic substance doctrine, sometimes known as the "economic substance sham transaction doctrine," as follows:

> It is well settled that taxpayers generally are free to structure their business transactions as they please, even if motivated by tax avoidance considerations. *See Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 196 (1983), *aff'd in part, rev'd in part, and remanded* 752 F.2d 89 (4th Cir. 1985). However, to be accorded recognition for tax purposes, a transaction generally is expected to have "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-

BRYAN CAVE LLP

May 17, 2002
Page 20

avoidance features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-584 (1978); *see Winn-Dixie Stores, Inc. v. Commissioner*, 113 T.C. 254, 278 (1999). This principle, which finds its origin in *Gregory v. Helvering*, *supra*, is better known as the "economic substance doctrine.

A sham transaction is one which, though it may be proper in form, lacks economic substance beyond the creation of tax benefits. *Karr v. Commissioner*, 924 F.2d 1018, 1022-1023 (11th Cir. 1991), *aff'g Smith v. Commissioner*, 93 T.C. 378 (1989). An evaluation whether a transaction is a substantive sham generally requires: (1) A subjective inquiry whether the transaction was carried out for a valid business purpose independent of tax benefits, and (2) a review of the objective economic effect of the transaction. *See Karr v. Commissioner*, *supra* at 1023; *Kirchman v. Commissioner*, 862 F.2d 1486, 1490-1491 (11th Cir. 1989), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986); *see also ACM Partnership v. Commissioner*, 157 F.3d 231, 247-248 (3d Cir. 1998), *aff'g in part and rev'g in part on another ground* T.C. Memo. 1997-115; *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990), *aff'g in part, rev'g and remanding in part on another ground Larsen v. Commissioner*, 89 T.C. 1229 (1987), *aff'g* T.C. Memo. 1987-628, *aff'g Sturm v. Commissioner*, T.C. Memo. 1987-625, *and aff'g Moore v. Commissioner*, T.C. Memo. 1987-626; *Rose v. Commissioner*, 868 F.2d 851, 853-854 (6th Cir. 1989), *aff'g* 88 T.C. 386 (1987). Only after we conclude that a transaction is not an economic sham do we review the tax consequences of the transaction under the Code. *See ACM Partnership v. Commissioner*, T.C. Memo. 1997-115, *affd. in part and rev'd in part on another ground* 157 F.3d 231 (3d Cir. 1998).

A taxpayer may establish that a transaction was entered into for a valid business purpose if the transaction is "rationally related to a useful nontax purpose that is plausible in light of the taxpayer's conduct and * * * economic situation." *Compaq Computer Corp. & Subs. v. Commissioner*, 113 T.C. 214, 224 (1999) (citing *ACM Partnership v. Commissioner*, *supra*); *see Kirchman v. Commissioner*, *supra* at 1490-1491. A taxpayer may establish that a transaction has objective economic consequences where the transaction appreciably affects the taxpayer's beneficial interest. *See Knetsch v. United States*, 364 U.S. 361, 366 (1960) (quoting

**BRYAN CAVE LLP**

> *Gilbert v. Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (Hand,
> J., dissenting)); *see also ACM Partnership v. Commissioner*,
> 157 F.3d at 248; *Northern Ind. Pub. Serv. Co. v. Commissioner*,
> 115 F.3d 506, 512 (7th Cir. 1997), *aff'g* 105 T.C. 341 (1995).
> Stated differently, <u>a transaction has economic substance if it offers
> a reasonable opportunity for profit exclusive of tax benefits</u>. *See*
> *Gefen v. Commissioner*, 87 T.C. 1471, 1490 (1986), and cases
> cited therein. Generally, there must be a reasonable expectation
> that nontax benefits will meet or exceed transaction costs. *See*
> *Yosha v. Commissioner*, 861 F.2d 494, 498 (7th Cir. 1988), *aff'g*
> *Glass v. Commissioner*, 87 T.C. 1087 (1986). Modest profits
> relative to substantial tax benefits are insufficient to imbue an
> otherwise dubious transaction with economic substance. *See*
> *Sheldon v. Commissioner*, 94 T.C. 738, 767-768 (1990); *Saba
> Partnership v. Commissioner*, T.C. Memo. 1999-359.

*Salina*, 80 T.C.M. (CCH) at 694 (emphasis added).

In *Salina*, the court found that "a perceived tax benefit . . . standing alone, is

insufficient to render the transaction a sham in substance." *Id.* at 695. The court then concluded

that the petitioner entered into the Salina Partnership to achieve a valid business purpose

independent of tax benefits.

Likewise, the Eighth Circuit held in *IES Industries, Inc. v. United States*, 253 F.3d

350 (8th Cir. 2001), that "[t]he fact that [a taxpayer] took advantage of duly enacted tax laws in

conducting [certain transactions] does not convert the transactions into shams for tax purposes."

*Id.* at 356 (footnote omitted). In *IES Industries*, the taxpayer, an investor owned electric utility

company, entered into American Depository Receipt ("ADR")[6/] trading opportunities identified

by a securities broker. The taxpayer purchased ADRs of certain companies which had

announced dividends with a settlement date before the record date for such dividends, causing

---

[6/]    An ADR is a publicly traded security or receipt which represents a share of a foreign corporation held in trust
by a U.S. bank, and which is fully negotiable in U.S. dollars.

BRYAN CAVE LLP

May 17, 2002
Page 22

the taxpayer to be the actual owner of the dividends on the record date. Once the right to the

dividends accrued to the taxpayer, the taxpayer immediately sold the ADRs back to the

counterparty with a settlement date of the transaction occurring after the record date for the

dividends. The cost of the ADRs purchased by the taxpayer (with dividend rights attached) was

more than the price at which the taxpayer resold the ADRs back to the counterparty, resulting in

capital losses to the taxpayer. These losses were intended by the taxpayer to be carried back to

previous tax years in order to offset capital gains it had incurred from sales of stock and thus to

obtain a federal income tax refund from those years. The taxpayer also claimed foreign tax

credits and certain deductions for interest, commissions, and foreign income tax withheld as a

result of the transactions.

The district court granted the Service's motion for summary judgment and

completely disregarded the transactions for tax purposes, concluding that the transactions "were

shaped solely by tax avoidance considerations" and lacked practical economic effect. 84

A.F.T.R.2d at 99-6447 (Sept. 22, 1999). The court phrased the question at issue as "whether

these transactions are a sham and therefore to be disregarded for tax purposes," and gave only a

cursory review of the law and facts. In its Order of Summary Judgment, the district court stated

that the taxpayer's only change in "economic position" as a result of the transactions was "the

transfer of the claim to the foreign tax credit to IES." *Id.* The court did not consider whether the

trades had a valid business purpose.

The taxpayer appealed, and the United States Court of Appeals for the Eighth

Circuit reversed the district court, finding that the ADR trades had <u>both</u> economic substance and

BRYAN CAVE LLP

May 17, 2002
Page 23

business purpose, and stating that "[t]he fact that IES took advantage of duly enacted tax laws in

conducting the ADR trades does not convert the transactions into shams for tax purposes." *Id.* at

356. Further, the Eighth Circuit allowed the loss deductions and foreign tax credits claimed by

the taxpayer.

In response to the Service's argument that the trades were shams because there

was no risk of loss, the circuit court disagreed, stating that:

> The risk may have been minimal, but that was in part because [the
> taxpayer] did its homework before engaging in the transactions.
> Company officials met twice with [the securities broker's]
> representatives and studied the materials provided. After that, [the
> taxpayer] consulted its outside accountants and its securities
> counsel for reassurances about the legality of the transactions and
> their tax consequences.

*Id.* at 355 (citation omitted). The court went on to conclude that "[w]e are not prepared to say

that a transaction should be tagged a sham for tax purposes merely because it does not involve

excessive risk. IES' disinclination to accept any more risk than necessary in these circumstances

strikes us as an exercise of good business judgment consistent with a subjective intent to treat the

ADR trades as money-making transactions." *Id.*

The Eighth Circuit decision in *IES Industries* was very recently relied upon by the

Fifth Circuit in its reversal of the Tax Court decision in *Compaq Computer Corp. v.*

*Commissioner. See Compaq Computer Corp. v. Comm'r*, 277 F.3d 778 (5th Cir. 2001), *rev'g*

113 T.C. 214 (1999). The ADR transaction at issue in *Compaq* was identical to the transaction

in *IES Industries*. The Tax Court had held that Compaq's engagement in the ADR transaction

lacked economic substance and a non-tax business purpose, and therefore should be disregarded

May 17, 2002
Page 24

for federal income tax purposes. The Fifth Circuit in *Compaq* stated that the Tax Court's

decision was "in conflict with" the Eighth Circuit's decision in *IES Industries*, and that as a

matter of law the ADR transaction was not a sham for tax purposes. *Compaq*, 277 F.3d at 782

(outlining the Eighth Circuit's legal analysis of economic substance and business purpose as

applied to the ADR transaction).

   With regard to economic substance, in addition to relying on the decision of *IES*

*Industries* that the gross dividend (rather than the dividend net of the foreign income tax) was to

be used to compute pre-tax profit, the Fifth Circuit in *Compaq* also noted that the Service was

trying to "stack the deck" against Compaq when calculating its after-tax profit by failing to

include the U.S. foreign tax credit which resulted from the transaction. Thus, the Tax Court's

calculation of profitability took into account the foreign income tax withheld (by reducing the

amount of the dividend), but did not include the benefit of the U.S. foreign tax credit, resulting in

a net loss of approximately $1.5 million. The Fifth Circuit referred to the Tax Court's

calculation as "a curious method of calculation," holding that:

> If the effects of tax law, domestic or foreign, are to be
> accounted for when they subtract from a transaction's net cash
> flow, tax law effects should be counted when they add to cash
> flow. To be consistent, the analysis should either count all tax law
> effects or not count any of them. To count them only when they
> subtract from cash flow is to stack the deck against finding the
> transaction profitable. During this litigation, the I.R.S. has
> consciously chosen to try to stack the deck this way. . . . The
> Commissioner, however, has provided no reason to endorse its
> approach . . . . That the Government would get more money from
> taxpayers does not suffice.

May 17, 2002
Page 25

*Compaq*, 277 F.3d at 785 (footnotes and citations omitted).  With regard to business purpose, the

Fifth Circuit found that Compaq was not solely motivated by the tax consequences resulting

from the ADR transaction, but that Compaq "actually and legitimately" also sought a pre-tax

profit.  *Id.* at 787.

In another so-called "economic substance case," the Eleventh Circuit Court of

Appeals reversed the Tax Court in *United Parcel Service of America, Inc. v. Commissioner*, 254

F.3d 1014 (11th Cir. 2001), *rev'g* 78 T.C.M. (CCH) 262 (1999).  In this case, the Tax Court had

originally held that the taxpayer's restructuring of its insurance program for shipping valuable

packages was a sham in substance.  Rather than providing insurance directly to customers for

such packages, the taxpayer restructured its program so that insurance was instead provided by a

foreign affiliate of the taxpayer.  The Tax Court concluded that:

> [[T]he taxpayer] has failed to prove that the restructuring of its
> [insurance program] was motivated by nontax business reasons or
> that the restructuring had economic substance. Rather, we find that
> the restructuring was done for the purpose of avoiding taxes and
> that the arrangement between [the parties] had no economic
> substance or business purpose.

78 T.C.M. (CCH) at 293 (footnote omitted).

On appeal, the circuit court held that the restructuring transaction had the requisite

business purpose and economic substance necessary to be respected for tax purposes.  The court

reasoned that:

> It may be true that there was little change over time in how the
> [restructured] program appeared to customers. But the tax court's
> narrow notion of "business purpose" — which is admittedly
> implied by the phrase's plain language — stretches the economic-
> substance doctrine farther than it has been stretched. A "business

May 17, 2002
Page 26

> purpose" does not mean a reason for a transaction that is free of tax
> considerations. Rather, a transaction has a "business purpose,"
> when we are talking about a going concern like [the taxpayer], as
> long as it figures in a bona fide, profit-seeking business. This
> concept of "business purpose" is a necessary corollary to the
> venerable axiom that tax-planning is permissible. The Code treats
> lots of categories of economically similar behavior differently. For
> instance, two ways to infuse capital into a corporation, borrowing
> and sale of equity, have different tax consequences; interest is
> usually deductible and distributions to equityholders are not.
> There may be no tax-independent reason for a taxpayer to choose
> between these different ways of financing the business, but it does
> not mean that the taxpayer lacks a "business purpose." To
> conclude otherwise would prohibit tax-planning.

254 F.3d at 1019 (citations omitted). The Eleventh Circuit, while noting that the restructuring

transaction at issue was "sophisticated and complex," nevertheless emphasized that "its

sophistication does not change the fact that there was a real business that served the genuine need

for customers to enjoy loss coverage and for [the taxpayer] to lower its liability exposure." *Id.* at

1020.

   *Salina, IES Industries, Compaq,* and *United Parcel Service, supra,* all relied upon

*Gregory v. Helvering,* 293 U.S. 465 (1935), for the proposition that a taxpayer is free to structure

his business transactions as he sees fit, unless the "sole purpose" of the transaction in question is

to reduce taxes. *See Salina* (quotation above); *IES Industries,* 253 F.3d at 355; *Compaq,* 277

F.3d at 786; *United Parcel Service,* 254 F.3d at 1019. In *Gregory v. Helvering,* the taxpayer

formed a corporation for the single purpose of liquidating it to avoid paying tax on a dividend

distribution. The Court found that the reorganization was "an operation having no business or

corporate purpose – a mere device which put on the form of a corporate reorganization as a

disguise for concealing its real character, and the sole object and accomplishment of which was

May 17, 2002
Page 27

**BRYAN CAVE LLP**

the consummation of a preconceived plan." *Gregory*, 293 U.S. at 469 (emphasis added). In

*Gregory*, the Court, therefore, concluded that "the facts speak for themselves and are susceptible

of but one interpretation," that "[t]he whole undertaking . . . was in fact an elaborate and devious

form of conveyance masquerading as a corporate reorganization, and nothing else." *Id.* at 470.

While the matter is not free from doubt, the facts involved herein are

distinguishable from those in *Gregory v. Helvering*. We understand that the intention of Coastal

and the Investor in using the LLC and Margate LLC was to consolidate the Investor's

investments for profit purposes independent of any tax benefit; *i.e.*, that, unlike Mrs. Gregory, the

Investor's sole purpose in using the LLC and Margate LLC was not merely to avoid taxes. Thus,

while *Gregory v. Helvering* is an instructive case on this issue, it should not necessarily control

the relevant federal income tax consequences to the Investor in this instance.

In general, as in *IES Industries*, *Compaq*, and *United Parcel Service*, the cases

have held that a transaction will be respected for tax purposes if it has "economic substance

which is compelled or encouraged by business or regulatory realities, is imbued with tax-

independent considerations, and is not shaped solely by tax-avoidance features that have

meaningless labels attached." *James v. Comm'r*, 899 F.2d 905, 908 (10th Cir. 1990) (quoting

*Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978)). A key factor in assessing the

economic substance of a transaction is whether the transaction has any practical economic effect

other than the creation of tax losses. Courts have refused to recognize the tax consequences of a

transaction that does not appreciably affect the taxpayer's beneficial interest except to reduce tax.

The presence of an insignificant pre-tax profit is not enough to provide a transaction with

**BRYAN CAVE LLP**

sufficient economic substance to be respected for tax purposes. *See Knetsch v. United States*,

364 U.S. 361, 366 (1960); *ACM Partnership v. Comm'r*, 157 F.3d 231, 248 (3d Cir. 1998);

*Sheldon v. Comm'r*, 94 T.C. 738, 768-69 (1990).

   In determining whether a transaction has sufficient economic substance to be

respected for tax purposes, courts have recognized that offsetting legal obligations, or circular

cash flows, may effectively eliminate any real economic significance of the transaction. For

example, in *Knetsch v. United States*, 364 U.S. at 361, the taxpayer purchased an annuity bond

using nonrecourse financing. However, the taxpayer repeatedly borrowed against increases in

the cash value of the bond. Thus, the bond and the taxpayer's borrowings constituted offsetting

obligations. As a result, the taxpayer could never derive any significant benefit from the bond.

The Supreme Court found the transaction to be a sham, as it produced no significant economic

effect and had been structured only to provide the taxpayer with interest deductions. *See id.* at

366. Similarly, in *Sheldon v. Commissioner*, 94 T.C. at 738, the Tax Court denied the tax benefit

of the transactions at issue because the real economic impact of the transactions was

"infinitesimally nominal and vastly insignificant when considered in comparison with the

claimed deductions." *Id.* at 769.[7]

---

[7] In *Sheldon*, the Tax Court denied the purported tax benefits of a series of Treasury bill sale-repurchase transactions because they lacked economic substance. In those transactions, the taxpayer bought Treasury bills that matured shortly after the end of the tax year and funded the purchase by borrowing against the Treasury bills. The taxpayer accrued the majority of its interest deduction on the borrowings in the first year while deferring the inclusion of its economically offsetting interest income from the Treasury bills until the second year. The transactions lacked economic substance because the economic consequences of holding the Treasury bills were largely offset by the economic cost of the borrowings.

May 17, 2002
Page 29

In *ACM Partnership v. Commissioner*, 73 T.C.M. (CCH) 2189 (1997), the taxpayer entered into a near-simultaneous purchase and sale of debt instruments. The Service had asserted that these transactions were entered into <u>solely</u> for tax motivated purposes without any realistic expectation of profit. The Tax Court concluded that the taxpayer's exchange of notes generated only "a phantom loss" that was not economically inherent in the object of the sale, and further that the transaction did not have "economic substance separate and distinct from economic benefit achieved solely by tax reduction." 73 T.C.M. (CCH) at 2215. The taxpayer appealed the decision of the Tax Court claiming that the tax consequences of the exchange should have been respected because there had been an exchange of materially different property. The appeals court disagreed.

The United States Court of Appeals for the Third Circuit in *ACM Partnership* found that the transaction with respect to the debt instruments left the taxpayer in the same position it had been in before engaging in the offsetting acquisition and disposition of the notes. The court thus held that taken together, the purchase and sale "had only nominal, incidental effects on [the taxpayer's] net economic position." *ACM Partnership*, 157 F.3d at 250. The appeals court ultimately denied the taxpayer the purported tax benefits of the transaction because the transaction lacked any significant economic consequences other than the creation of tax benefits.

In another case, *ASA Investerings Partnership v. Commissioner*, 76 T.C.M. (CCH) 325 (1998), *aff'd*, 201 F.3d 505 (D.C. Cir. 2000), *cert. denied*, 121 S. Ct. 171 (2000), the Tax Court analyzed whether a valid partnership was actually formed at the outset. The

May 17, 2002
Page 30

transactions in this case were entered into to take advantage of the contingent installment sales

rules, and were found by the Tax Court to be structured to minimize the partnership's exposure

to risk and for the sole purpose of generating tax losses. In affirming the Tax Court, the D.C.

Circuit in *ASA Investerings* held that none of the purported partners in that case had the intent to

form a real partnership – "[a] partner whose risks are all insured at the expense of another partner

hardly fits within the traditional notion of partnership." 201 F.3d at 515. Consequently, the

circuit court did not even reach the economic substance issue.

          In the case of *Boca Investerings Partnership v. United States, supra*, on the other

hand, the District Court for the District of Columbia, in contrast with the Court of Appeals for

the D.C. Circuit in *ASA Investerings*, held that the creation of and investment in the partnership

at issue, and the transactions entered into by such partnership, in fact, had economic substance

because the partner involved had a non-tax business purpose, specifically, to make investments

that would generate a profit. *Boca Investerings* involved the same tax structure which had been

developed by Merrill Lynch subsequently challenged by the Service, and finally litigated in *ASA*

*Investerings, ACM Partnership*, and *Saba Partnership*, T.C. Memo. 1999-359, *vacated and*

*remanded*, No. 00-1328 (D.C. Cir. Dec. 21, 2001), all cases in which the courts denied the

claimed tax benefits (as discussed above). Unlike the Tax Court, the court in *Boca Investerings*

seemed impressed by the factual record surrounding the creation of the partnership and the

purposes for engaging in the transactions at issue, and at one point noted that "the facts as found

by this Court from the evidence at trial in this case are materially different from the facts in *ASA*

*Investerings Partnership* recently decided by the Tax Court and affirmed by the D.C. Circuit -- a

May 17, 2002
Page 31

case defendant argues is strikingly similar to this one, but which in fact is quite different." *Id.* at

381 (discussing how the crucial facts in *ASA Investerings*, which caused the Tax Court to

disregard the partnership in that case, were not present in *Boca Investerings*).

With respect to the issue of whether the transactions in *Boca Investerings* had

economic substance, the district court looked to a test set forth by the D.C. Circuit in *Horn v.*

*Commissioner*, 968 F.2d 1229 (D.C. Cir. 1992). The court in *Horn* provided a test for

determining whether a transaction should be treated as a sham for tax purposes, holding:

> To treat a transaction as a sham, the court must find (1) that the
> taxpayer was motivated by no business purpose other than
> obtaining tax benefits in entering the transaction, and (2) that the
> transaction has no economic substance because no reasonable
> possibility of profit exists.

*Horn*, 968 F.2d at 1237 (quoted by *Boca Investerings*). Interpreting this test set forth in *Horn*,

the court in *Boca Investerings* held that:

> The decision in *Horn* also makes plain that a transaction is
> not a sham and will be recognized for tax purposes if the taxpayer
> satisfies *either* part of the test for economic substance -- if either
> (1) using a subjective analysis, the transaction has a nontax
> business purpose, *or* (2) using an objective analysis, the transaction
> has a reasonable possibility of generating a profit, ex ante. *Horn v.*
> *Commissioner*, 968 F.2d at 1237-38. The D.C. Circuit expressly
> recognized that "a transaction undertaken for a nontax business
> purpose will not be considered an economic sham *even if* there was
> no objectively reasonable possibility that the transaction would
> produce profits." *Id.* at 1239 (emphasis in original). By the same
> token, a transaction that has economic consequences other than tax
> benefits will not be disregarded even if it was motivated by tax
> considerations.    Both factors are considered in applying the
> traditional sham transaction test, but the transaction will be
> recognized if either is satisfied. *Horn v. Commissioner*, 968 F.2d
> at 1237 ("a transaction will not be considered a sham if it is

**BRYAN CAVE LLP**

> undertaken for profit or for other legitimate nontax business
> purposes").

*Boca Investerings*, 167 F. Supp. 2d at 376-77 (emphasis in original) (some citations omitted).

Applying the test in *Horn*, the court in *Boca Investerings* held that the transactions

satisfied both prongs of the test, even though only one prong need have been met. First, the court

held that the plaintiffs had established by a "preponderance of the evidence" that the transactions

had a non-tax business purpose, namely to make a profit. The evidence showed that the partner

at issue had engaged in pre-transaction due diligence in order to evaluate the credit quality, risk

profile, and rate of return of potential investments, and had picked investments that the partner

thought could make a profit. Each proposed transaction was evaluated separately, and according

to the court, "[w]hile potential tax benefits were considered by [the partner], it was understood

that [the partner] was not committing to engage in all of the transactions necessary under the

Merrill Lynch presentation in order to give rise to a tax loss." *Id.* at 378. The record showed that

the partner would not have invested in the partnership if the partner did not think that the

partnership's investments would be profitable.

In addition, in finding that the second prong also had been met, the court in *Boca*

*Investerings* found that "the great weight of evidence" supported the plaintiffs' position that the

transactions at issue had a reasonable possibility of turning a profit. The potential for

profitability resulted in the partnership's holding of private placement notes ("PPNs") and

contingent installment payment agreements ("LIBOR Notes"). The LIBOR Notes were sensitive

to fluctuations in interest rates, and due to the real possibility of movements in interest rates,

there existed a significant possibility for the holder of the LIBOR Notes to either make or lose a

May 17, 2002
Page 33

substantial amount of money. Because of this, the court held that there was a "reasonable

prospect for profit." *Id.* at 380.

Similarly, in *IES Industries, Inc. v. United States, supra* (discussed above), the

Eighth Circuit held that the transactions at issue did in fact have economic substance because the

economic benefit to the taxpayer was the amount of the <u>gross</u> dividend received by the taxpayer,

before foreign taxes were withheld, rather than the net dividend received as argued by the

Service. Despite the fact that the taxpayer actually only received 85% of the dividend in cash

once the foreign tax was withheld, the taxpayer for U.S. federal income tax purposes was treated

as having received 100% of the dividend and the taxpayer would be liable for U.S. income taxes

on 100% of the dividend. The court thus held that "[b]ecause the entire amount of the ADR

dividends was income to [the taxpayer], the ADR transactions resulted in a profit, an economic

benefit to [the taxpayer]." 253 F.3d at 354. *See also Compaq Computer Corp v. Comm'r, supra*

(discussed above).

In addition, in the case of *United Parcel Service of America, Inc. v.*

*Commissioner, supra,* (discussed above), the Eleventh Circuit, in reversing the Tax Court, held

that the restructuring transaction at issue had sufficient "economic effects" to warrant respect for

tax purposes. The court noted that the newly structured insurance program resulted in (i) the

creation of genuine obligations of the taxpayer enforceable by an unrelated party, and (ii) the loss

by the taxpayer of a stream of income from customer fees. Therefore, the Eleventh Circuit

determined that "[t]here were . . . real economic effects from this transaction on all of its parties,"

**BRYAN CAVE LLP**

May 17, 2002
Page 34

and that because the transaction had real economic effect and a business purpose, it "had sufficient economic substance to merit respect in taxation." 254 F.3d at 1020.

      In the instant situation, the Service could attempt to apply the economic substance doctrine to disregard the LLC and/or Margate LLC. In order to apply this doctrine to disregard one or both of these entities, however, the Service would be required to show: (1) when the Investor contributed the investments to the LLC and subsequently to Margate LLC there was no significant potential for pre-tax profit (an objective test), and (2) the Investor utilized the LLC and Margate LLC for no valid business purpose other than to obtain tax benefits (a subjective test). The formation and use of the LLC and Margate LLC should be viewed as distinguishable from cases like *Knetsch*, *Sheldon*, and *ACM Partnership* because, among other things, at the time of their formation they offered "a reasonable opportunity for profit exclusive of tax benefits." *Salina*, 80 T.C.M. (CCH) at 694 (citation omitted). Here, at the time of the contribution to the LLC and the subsequent contribution to Margate LLC, unlike *Gregory v. Helvering*, 293 U.S. 465 (1935), and the other cases discussed above, we understand that the Investor expected to realize a pre-tax profit on initially owning an interest in the LLC and subsequently in Margate LLC, even taking into account transaction costs. In addition, as discussed above, we understand that the LLC and Margate LLC have been formed for investment purposes independent of tax benefits. As stated in *IES Industries*, "[a] taxpayer's subjective intent to avoid taxes thus <u>will not by itself</u> determine whether there was a business purpose to a transaction." 253 F.3d at 355 (emphasis added).

**BRYAN CAVE LLP**

May 17, 2002
Page 35

### C.     <u>Partnership Anti-Abuse Regulations</u>

Another means by which the Service may seek to attack the formation and

operation of the LLC and Margate LLC is through the application of the so-called Partnership

Anti-Abuse Regulations. *See* Treas. Reg. section 1.701-2. The Partnership Anti-Abuse

Regulations grant the Service broad authority to recast a transaction if a partnership is formed or

availed of, in connection with such transaction, and a principal purpose of such transaction is to

reduce substantially the present value of the partners' aggregate U.S. federal income tax liability

in a manner that is inconsistent with the intent of subchapter K of the Code, which governs

partnerships. Treas. Reg. section 1.701-2(a) provides that the intent of subchapter K is "to

permit taxpayers to conduct joint business (including investment) activities through a flexible

economic arrangement without incurring an entity-level tax." Implicit in this intent, according to

the Regulations, are the following three requirements: (i) the partnership must be *bona fide* and

the transaction under scrutiny must be entered into for a substantial business purpose; (ii) the

form of the transaction must be respected under the substance-over-form principles; and (iii) the

tax consequences of the transaction must properly reflect the partners' economic agreement and

clearly reflect the partners' income unless any deviation from this standard is clearly

contemplated by the applicable provision of the Code or Regulations. *See* Treas. Reg. section

1.701-2(a). Where the three requirements are not satisfied, the Service is granted authority,

among other recharacterizations, to disregard the partnership in whole or in part, or otherwise to

adjust or modify the claimed tax treatment. Specifically, the Regulations provide that:

> [C]ertain provisions of subchapter K and the regulations
> thereunder were adopted to promote administrative convenience

May 17, 2002
Page 36

and other policy objectives, with the recognition that the
application of those provisions to a transaction could, in some
circumstances, produce tax results that do not properly reflect
income. Thus, the proper reflection of income requirement of this
paragraph (a)(3) is treated as satisfied with respect to a transaction
that satisfies paragraphs (a)(1) and (2) of this section to the extent
that the application of such a provision to the transaction and the
ultimate tax results, taking into account all the relevant facts and
circumstances, are clearly contemplated by that provision.

Treas. Reg. section 1.701-2(a)(3).

The determination of the applicability of the Partnership Anti-Abuse Regulations

requires a facts and circumstances analysis of the transaction at issue. This analysis, in turn,

requires a comparison of the purported business purpose of the transaction with the claimed tax

benefits resulting from the transaction. *See* Treas. Reg. section 1.701-2(c). As discussed above,

the formation of the LLC in the instant situation provides the Investor with an investment

opportunity on a trial basis that has a potential for appreciation, and thereby a profit potential

recognizing the volatility in the current foreign currency markets. *See Northern Indiana Public

Service Co. v. Commissioner*, 115 F.3d 506 (7th Cir. 1997) (conclusion by the Seventh Circuit

Court of Appeals that the transactions at issue had economic substance because the finance

company earned a profit when it borrowed funds at a rate of 17.25 percent and lent the proceeds

to its parent at a rate of 18.25 percent). We understand that Coastal advised the Investor that the

LLC's holding of the MLD positions, leveraged hedge fund interests, foreign currency contracts

and other similar investments described above will provide a reasonable potential to make a

sizable profit in a very short time period. We also understand that Coastal advised the Investor

that an investment in Margate LLC would provide the Investor with an investment opportunity

### BRYAN CAVE LLP

with more advantageous purchasing power as well as reduced transaction and administrative costs due to the size of the collective investments with other investors.

In addition, we understand that neither the LLC nor Margate LLC possess the negative factors, as enumerated in the applicable Treasury Regulations, which tend to indicate a purpose inconsistent with subchapter K. For example, with respect to the initial formation of the LLC: (i) the Investor had a substantial interest in the LLC, had the right to participate in all of the profits of the LLC, retained significant upside potential with respect to the LLC assets, and was not protected from downside risk; and (ii) the LLC's assets upon dissolution were allocated in accordance with the Investor's percentage ownership interest. Likewise, the Investor has the right to participate in the profits of Margate LLC, is not protected from downside risk, and generally will be allocated Margate LLC's gains and losses in accordance with the Investor's percentage ownership interest. Thus, it is more likely than not that the Service should not be successful in an attempt to recast the LLC, Margate LLC and their investments as inconsistent with the intent of subchapter K of the Code.

### D.    No Assignment of Income

Under the assignment of income doctrine, income earned from property generally must be included in gross income of the person who beneficially owns the property. *See Blair v. Comm'r*, 300 U.S. 5, 12 (1937) ("[t]he one who is to receive the income as the owner of the beneficial interest is to pay the tax."). This doctrine should not apply to the transfer of the long and short MLD positions, thus causing the Investor to be taxed on income arising from the MLD positions, because the Investor should be viewed as having had a valid business/investment

**BRYAN CAVE LLP**

May 17, 2002
Page 38

purpose for transferring the long and short MLD positions to the LLC. *Cf.* Rev. Rul. 80-198,

1980-2 C.B. 113 (holding that where there is a valid business purpose for the transfer of accounts

receivable and all assets of a proprietorship, the assignment of income doctrine will not override

the nonrecognition provisions of Section 351).

Furthermore, at the time of the transfer of the long and short MLD positions there

should not be any immediate right to the contingent interest payment. Consequently, the transfer

of the long and short MLD positions to the LLC likely would not constitute an anticipatory

assignment of income such that income arising on the settlement of the MLD positions would be

taxable to the Investor. *Cf. Cold Metal Process Co. v. Comm'r*, 247 F.2d 864 (6th Cir. 1957),

rev'd, 25 T.C. 1333 (1956) (assignment of income doctrine was not applied to certain transfer of

contract claims for money damages). Instead, any income derived from the MLDs should be

included in the income of their then beneficial owner, the LLC, not the Investor. While the short

MLD position may not be viewed as "property" for purposes of section 721, the above rationale

likely would equally apply to it and any income recognized when the short position matures

would also be included in the income of the LLC, not the Investor.

### E.  Agency Doctrine Inapplicable

The Service might assert that the Investor was acting as the LLC's agent in

acquiring the MLD positions and thus that the Investor should be treated as having contributed to

the LLC not the MLD positions but only the net cash needed to acquire them.

The United States Supreme Court has addressed the issue of when an agency

relationship exists and affects tax results of a transaction in *Commissioner v. Bollinger*, 485 U.S.

**BRYAN CAVE LLP**

May 17, 2002
Page 39

340 (1988), where, using the six-part test established in *National Carbide Corp. v.*

*Commissioner*, 336 U.S. 422 (1949), the Court held that a corporation that held nominal title to

property on the taxpayer's behalf was the taxpayer's bona fide agent and rejected the Service's

contention that the corporation was the property's true owner.  The "six *National Carbide*

factors" are:

        i.      whether the corporation operates in the name and for the account of the principal;

        ii.     whether the agent corporation binds the principal by its actions;

        iii.    whether the corporation transmits money received for the account of the principal to the principal;

        iv.    whether the receipt of income is attributable to the services and assets of the principal and not the agent;

        v.     whether the corporation is a true agent; that is, whether its relations with its principal are dependent on the latter's ownership of the agent; and

        vi.    whether the corporation's business purpose is the carrying on of the normal duties of an agent.

*See Bollinger*, 485 U.S. at 346-47.

        The Court found that the genuineness of the agency relationship was adequately

assured  because (1) the relationship was set forth in a written agreement at the time each

particular asset was acquired; (2) the corporation acted as an agent and not principal with respect

to the asset for all purposes; and (3) the corporation held itself out as the agent and not as a

principal in all dealings with third parties related to the asset.  *See id.* at 349-50.  *See also*

*Cottage Savings Assoc. v. Comm'r*, 499 U.S. 554 (1991) (no agency when parties act at arm's

**BRYAN CAVE LLP**

May 17, 2002
Page 40

length and transactions between them have legal and economic substance); *cf. Northern Indiana Pub. Serv. Co. v. Comm'r*, 115 F.3d 506, 511 (7th Cir. 1997).

An application of the *National Carbide* agency factors to the Transactions would likely not result in a finding of agency. No indicia of a principal/agent relationship between the LLC and the Investor exists. The LLC and the Investor should be viewed as acting independently of one another. In acquiring the initial MLD positions, we understand that the Investor did not operate in the name of the LLC, had no authority to bind the LLC by its actions, did not transmit or receive funds on behalf of the LLC, did not receive income attributable to services or assets of the LLC, and did not act as a true agent or have as its business purpose the carrying out of normal duties of an agent. Furthermore, unlike *Bollinger*, there were no agency agreements involved and no party has acted as the agent of another or held itself out as an agent in dealings with any third parties. Moreover, as in *Cottage Savings*, the parties should be viewed as acting at arm's length and the transactions between them should have both legal and economic significance. Finally, the Investor had all of the benefits and burdens of ownership of the MLD positions until the MLD positions were contributed to the LLC. Accordingly, the agency doctrine likely should not apply to the Transactions.

F.    **Tax Basis**

Section 721 provides that no gain or loss is recognized to a partnership or any of its partners in the case of a contribution of property to a partnership in exchange for an interest in the partnership. Section 721(b), however, provides that this general rule will not apply to any gain realized on a transfer of property to a partnership which would be treated as an investment

**BRYAN CAVE LLP**

company (within the meaning of section 351(e)) if the partnership were incorporated. For an

entity to be treated as an investment company, the contributions must result "directly or

indirectly, in diversification of the transferors' interests." Treas. Reg. section 1.351-1(c)(1).

The special rule set forth in section 721(b) should not apply in this instance

because the LLC should not be treated as an investment company under the rules of

section 351(e). Here, we understand that Coastal has structured the initial investments by the

participating investors, including the Investor, so that the contributions by the participating

investors should not be viewed as a diversification. *See* Treas. Reg. section 1.351-1(c)(5) (where

"nonidentical assets . . . constitute an insignificant portion of the total value of assets

transformed"). *Compare* Rev. Rul. 87-9, 1987-1 C.B. 133 (transfer of stock by some transferors

and transfer of cash by other transferors resulted in diversification when cash transferred

"represented a significant part of value of property transferred"). Even if there were

diversification, given the actual timing of the purchase of the initial MLD positions, and the

contribution of the same to the LLC, little or no gain or loss should likely be realized.

Section 722 provides, in general, that "[t]he basis of an interest in a partnership

acquired by a contribution of property, including money, to the partnership shall be the amount

of such money and the adjusted basis of such property to the contributing partner at the time of

the contribution . . . ." In the instant situation, the Investor has contributed the MLD positions

and cash in exchange for Class A Units in the LLC. Under the general rules as outlined above,

although the result is not free from doubt, it would appear that the Investor's basis in the LLC

interest should likely be equal to the amount of cash contributed plus the Investor's purchase

BRYAN CAVE LLP

May 17, 2002
Page 42

price of the long MLD position.  While it is possible that the Service could argue that the long

and short MLD positions together should be treated as a single property interest (because the

long and short MLD positions will be purchased or sold on the same date with the same

counterparty), we think that it is more likely than not that they should be treated as separate

interests for federal income tax purposes so that the purchase price of the long MLD position

should not be reduced by the payment received with respect to the short MLD position.  *Cf.*

*Smith v. Comm'r*, 78 T.C. 350 (1982) (holding that each leg of a straddle should be treated as

separate property, regardless of whether the legs were acquired at different times or at the same

time).

Although the MLDs are likely viewed as debt instruments with contingent

interest, by analogy, there is additional support for treating the long and short MLD positions as

separate investments in the federal income tax treatment of options.  Section 1234 provides, in

general, that gain or loss attributable to the failure to exercise an option to buy or sell property

will be considered gain or loss from the sale or exchange of property which has the same

character as the property to which the option relates.  If an option is exercised, the option cost, or

premium, is included in determining the total cost basis of the property.  *See* Rev. Rul. 78-182,

1978-1 C.B. 265.  From this Ruling, it can be inferred that the holder of the option obtains a

basis in the option (until exercise or lapse) equal to the cost of the premium.  The Service also

ruled in Rev. Rul. 78-182 that where both a put and call are sold at the same time for separate

identifiable premiums, the writer determines its gain or loss for each position by reference to the

separate premium received for each position.  Consequently, as Rev. Rul. 78-182 illustrates, it

**BRYAN CAVE LLP**

May 17, 2002
Page 43

appears to be the long-standing view of the Service not to merge two offsetting positions for

determining a taxpayer's basis in each position. Similarly, in the instant case, we understand that

the long and short MLD positions will be bought or sold for separate identifiable purchase prices,

and, therefore, the tax basis for the long MLD should be equal to the purchase price paid by the

Investor without diminution for the amount received from the counterparty on the sale of the

short MLD.[8]

### G.    Treatment of MLDs as Debt Instruments With Contingent Interest

The MLD is a bank deposit with DB pursuant to which DB is obligated to pay

interest at a certain rate if the applicable financial market measure is reached. As a bank deposit,

the MLD should likely be treated as a debt instrument for U.S. federal income tax purposes. *See,*

*e.g.,* Rev. Rul. 85-119, 1985-2 C.B. 60 (analyzing whether certain equity-flavored bank holding

company securities should constitute debt rather than equity for federal income tax purposes);

Notice 94-47, 1994-1 C.B. 357 (setting forth relevant factors to be considered in debt versus

equity characterization). *See also* David P. Hariton, "Distinguishing Between Equity and Debt in

the New Financial Environment," 49 *Tax L. Rev.* 499, 500 (1994) (analyzing the distinction

between equity and debt, and noting that such distinction "turns on relative participation in the

burdens and benefits of ownership").

As a short-term obligation, as defined in Treas. Reg. section 1.1271-1(b), any

payments made with respect to the MLD in excess of the purchase price should likely be treated

---

[8]    We note that the long and short MLD positions herein are not part of a straddle as that term is utilized in Rev. Rul. 78-182, nor should these MLD positions constitute a straddle within the meaning of section 1092 because, as explained *inter alia*, MLDs will not be actively traded.

# BRYAN CAVE LLP

May 17, 2002
Page 44

as interest income.  Similarly, the contingent interest component of the MLD would likely be

subject to the contingent interest rules set forth in Treas. Reg. sections 1.1275-4 and 1.1275-5.

Under these rules, given the timing and structure, any contingent payment received should likely

be treated as interest, reportable, for federal income tax purposes, at the time the contingency is

satisfied.

### H.    Impact of Section 752 and Related Authorities

Section 752, relating to the treatment of certain liabilities, provides that an

increase in a partner's share of liabilities, or any increase in a partner's individual liabilities by

reason of the assumption by such partner of partnership liabilities, will be considered as a

contribution of money by such partner to the partnership.  Any decrease in a partner's share of

liabilities, or any decrease in a partner's individual liabilities by reason of the assumption by the

partnership of such individual liabilities, will be considered as a distribution of money to the

partner by the partnership.  The term "liabilities" is not defined in either the Code or Treasury

Regulations.  As discussed above, because the MLDs should likely be viewed as debt

instruments, the contingent interest component should not be viewed as a liability of the LLC for

purposes of section 752.

The courts have held that obligations which are contingent or speculative are not

liabilities for purposes of section 752, a principle which the Service has consistently followed.

*See, e.g., Long v. Comm'r*, 660 F.2d 416 (10th Cir. 1981), *aff'g* 71 T.C. 1 (1979); *Brountas v.*

*Comm'r*, 692 F.2d 152 (1st Cir. 1982).  This line of authority is based on the theory that

contingent or speculative obligations cannot give rise to basis.  *See, e.g., Denver & Rio Grande*

*Western Railroad Co. v. United States*, 505 F.2d 1266 (Ct. Cl. 1974); *Lemery v. Comm'r*, 52 T.C.

367 (1969), *aff'd* 451 F.2d 173 (9th Cir. 1971).

　　　　In *Long*, the Tenth Circuit addressed whether certain contested claims against a

partnership were liabilities under section 752.  In holding that the obligations were not liabilities,

the court stated:

> [The Tax Court] held that because the lawsuit claims against the
> partnership were indefinite and contingent liabilities, they should
> not be recognized for basis adjustment purposes *until the exact
> amounts of the liabilities were established*.  After the parties
> settled those suits, the Tax Court treated the settlement totals plus
> attorneys' fees incurred as partnership liabilities and permitted
> adjustment of the estate's basis in the partnership interest to the
> extent of its 25% interest.  *See* 1 W. McKee, W. Nelson &
> R. Whitmire, *Federal Taxation of Partnerships and Partners*
> ¶ 7.01[2] (1997).  We agree with this approach and holding.

*Long*, 660 F.2d at 419 (emphasis added).

　　　　The *Brountas* case involved an oil and gas drilling partnership investment

partially paid with nonrecourse obligations that were to be satisfied only out of oil production

payments.  The First Circuit characterized the obligation as highly contingent and speculative

and seeming "less like the repayment obligation that typically accompanies a recourse loan than

like a device for sharing business risks — the risks that accompany oil explorations."  692 F.2d

at 158.  As a result, the court similarly held that the obligations were not partnership liabilities

for the purposes of section 752.

　　　　In determining whether an obligation is contingent, the analysis generally stops if

the terms of the obligation objectively impose a contingency.  *See, e.g., Denver & Rio Grande*

May 17, 2002
Page 46

*Western Railroad Co. v. United States*, 505 F.2d 1266 (Ct. Cl. 1974); *Lemery v. Comm'r*, 52 T.C.

367 (1969), *aff'd* 451 F.2d 173 (9th Cir. 1971).

In *Denver & Rio Grande Western Railroad Co.*, the Court of Claims refused to

allow the taxpayer, a railroad, to include in its basis advances by a customer (used to build a

"spur line") which were repayable only out of proceeds from shipping above a certain annual

tonnage for ten years. The taxpayer argued that the repayment obligation was not contingent

because in light of the underlying facts and circumstances, it could be predicted with "reasonable

certainty" that the advances would be repaid in full. The court rejected the argument, stating that

it did not matter what the parties' subjective intentions were. Absent a binding obligation to

repay all of the advances at the time the subject deductions were taken, the court considered it

"impossible" to value the obligation assumed. *See* 505 F.2d at 1269-70.

In *Lemery*, the Tax Court held that an obligation to pay part of the purchase price

of a business out of "net profit" was too contingent to be included in the purchaser's basis. The

petitioners were unsuccessful in arguing that, although the amount was contingent, the liability

itself was absolute. *See* 52 T.C. at 377-78.

Further, in *La Rue v. Commissioner*, 90 T.C. 465 (1988), the Tax Court held that

liabilities attributable to an accrual basis partnership's deductible expenses must meet the "all

events" test of section 461 (described below) before they would be considered "liabilities" for

inclusion in the basis of a partner's partnership interest. In this case, La Rue was a general

partner of Goodbody and Co. ("Goodbody") a large stock brokerage firm. Due to the inability of

record-keeping technology at the time to keep up with trading volume, Goodbody incurred large,

**BRYAN CAVE LLP**

unanticipated "back office" liabilities. These back office liabilities were created by the following

types of transactions:

(1)    Fails to Receive — Securities which the broker should have purchased at a stated price were not purchased. Gain or loss would be incurred on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities. These transactions were the functional equivalent of short sale transactions.

(2)    Fails to Deliver — Securities which the broker thought were sold to another broker but for which no "comparison" for proof could be provided. These securities then had to be sold and the gain or loss incurred was measured by the difference between the original sales price and the actual proceeds received.

(3)    Securities Differences — These represented differences between the securities the broker's records stated it should be holding for its own or other's accounts and the securities actually "in the box." These resulted mainly from incorrect deliveries, receipts, or thefts. Gain or loss was measured by the value of excess securities or their replacement cost.

(4)    Dividend Errors — The broker was responsible to its customers for dividends and interest on securities which it held as nominee for its customers, that is, securities held in "street name." If the broker failed to receive a dividend or interest payment when due, it was still liable to its customer for such amount.

Due to the large losses generated by these back office problems and the

withdrawal of capital by subordinated lenders, Goodbody was in violation of the New York

Stock Exchange minimum capital requirements. At the same time, another brokerage firm,

Merrill Lynch, agreed to acquire Goodbody. The acquisition transaction raised the issue as to

whether La Rue, and the other Goodbody partners, could include the back office liabilities in the

bases of their partnership interests.

**BRYAN CAVE LLP**

May 17, 2002
Page 48

The Tax Court held that the Goodbody partners could <u>not</u> include these back office liabilities in their bases because the "all events" test had not been met. The court reasoned that:

> Because an accrual basis partnership uses the "all-events" test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis.

*La Rue*, 90 T.C. at 478 (citations omitted). The all-events test is met with respect to any item if all events have occurred which determine the fact of the liability and the amount of the liability can be determined with reasonable accuracy. *See* Treas. Reg. section 1.461-1(a). The court found that while Goodbody had a liability to its customers for their back office failures, the amount of these liabilities were not determinable with reasonable accuracy until any missing securities were purchased or excess securities were sold at the market price. *See La Rue* at 479.

In the present case, the LLC's obligation pursuant to the short MLD position is analogous to the contingent obligations discussed in the above cases. *See also* Treas. Reg. sections 1.1275-4 and 1.1275-5. By its terms, the short MLD contingent interest position was both contingent and speculative. We understand that there was uncertainty as to the amount of the contingent interest obligation, if any, until the date the short MLD position matured. At the time the short MLD position was contributed to the LLC, whether the LLC would become obligated to pay the Counterparty, depended solely upon whether the MLD's payment target was reached. We understand that there was no way of ascertaining whether the LLC would be required to make a payment to DB. Thus, the all events test should not be met because the amount of the short MLD contingent interest obligation, at the time of contribution, could not be

# BRYAN CAVE LLP

May 17, 2002
Page 49

determined with reasonable accuracy.  Consequently, the short MLD contingent interest position

should not be taken into account in determining the Investor's tax basis in the LLC.

The conclusion that the contingent interest obligation under the short MLD is not

a partnership liability for tax purposes is also supported by former Temp. Treas. Reg.

section 1.752-1T(g) (T.D. 8237, 1989-1 C.B. 180 (1988)).[9/]  That temporary regulation, which

---

[9/]    Temp. Treas. Reg. section 1.752-1T(g) defined partnership liabilities as follows:

> **(g)  Liability defined.**  Except as otherwise provided in the regulations under section 752,* an obligation is a liability of the obligor for purposes of section 752 and the regulations thereunder to the extent, *but only to the extent,* that incurring or holding such obligation gives rise to —
>
> (1)  The creation of, or an increase in, the basis of any property owned by the obligor (including cash attributable to borrowings);
>
> (2)  a deduction that is taken into account in computing the taxable income of the obligor; or
>
> (3)  An expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.
>
> See examples (2) and (3)(ii) of paragraph (k) of this section.

Paragraph (k) of the temporary regulations addressed the definition of partnership liability as follows:

> **(k)  Examples.**  The following examples illustrate the application of the rules of this section.  Except as otherwise provided, these examples assume that (1) the partnerships discussed therein are formed under state laws corresponding to the Uniform Partnership Act or the Revised Uniform Limited Partnership Act, whichever is appropriate, (2) partnership indebtedness constitutes debt for federal income tax purposes, and (3) any debt instrument given in consideration for the sales or exchange of property bears adequate stated interest (within the meaning of section 1274(c)).
>
> . . . .
>
> Example (2).    (i) C and D are partners in a general partnership that uses the cash method of accounting.  At the close of its taxable year, the partnership has accrued interest expense of $1,000 and accounts payable of $500 for services performed on behalf of the partnership.

May 17, 2002
Page 50

was effective from December 29, 1988, through December 29, 1991, defined partnership

liabilities and, through examples, provided that a partnership obligation governed by Temp.

---

                (ii) Under its method of accounting, the partnership's accrued interest expense and accounts payable are not deductible until paid. Also, the partnership obligations represented by those items have not created or increased the basis of any partnership property or given rise to a nondeductible expenditure of the partnership that is not properly chargeable to capital account. As provided by paragraph (g) of this section *an obligation that constitutes a debt for federal income tax purposes is a liability of the obligor only to the extent that incurring or holding such obligation gives rise to (1) the creation of, or an increase in, the basis of any property owned by the obligor,* (2) a deduction that is taken into account in computing the taxable income of the obligor, or (3) an expenditure that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital. Therefore, the partnership obligations for accrued but unpaid interest expense and accounts payable are not partnership liabilities for purposes of section 752.

            Example (3).    (i) E and F form a general partnership with cash contributions of $20,000 each. The partnership agreement provides that E and F will share all partnership profits and losses equally. The partnership purchases depreciable personal property for $40,000 in cash and a recourse purchase money note for $60,000.

                (ii) The indebtedness represented by the purchase money note is a partnership liability because incurring that obligation creates an additional $60,000 of basis in the partnership's depreciable personal property. See paragraph (g) of this section. . . . (emphasis added).

On July 31, 1991, Treasury issued proposed regulations (the "Proposed Regulations") designed to "simplify the Temporary Regulations." (Preamble to PS-49-91 (Federal Register, July 31, 1991)). The Proposed Regulations, which are generally effective after December 28, 1991, delete entirely the definition of "liability" for purposes of section 752. The preamble to the Proposed Regulations does not reveal any substantive reason for this deletion, other than the streamlining of the Temporary Regulations. The definition was likewise excluded from the final Regulations without explanation. One commentator has noted that "[w]hile the final Regulations inexplicably fail to include that definition, it would appear an appropriate definition for purposes of the final Regulations as it was the distillation of numerous judicial and administrative pronouncements." Willis, Pennell and Postlewaite, *Partnership Taxation,* ¶ 6.01[2] (6th ed. 1999) (footnote omitted). This appears to be confirmed by the Service's failure to revoke Rev. Rul. 88-77 which contains a "liability" definition identical to that contained in the Temporary Regulations.

      *   "Notwithstanding the 'except as otherwise provided' proviso at the beginning of this definition, there appear to be no exceptions under which an obligation that satisfies any of the enumerated criteria is not a liability, <u>or under which an obligation that does not satisfy any of the criteria is a liability.</u>" McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners,* ¶ 7.01[1] at n.3 (2d ed. 1990) (emphasis added).

May 17, 2002
Page 51

Treas. Reg. section 1.752-1T must first be debt for U.S. federal income tax purposes in order to

qualify as a partnership liability under section 752. *See, e.g., Chevron Corporation v. Comm'r,*

104 T.C. 719, 771-74 (1995) (regarding effect of examples under a regulation). Although the

final regulations under section 752 do not contain a definition of the term "liability," the

Service's position on what in fact is a liability is articulated in Rev. Rul. 88-77, 1988-2 C.B.

128 — the Service held that for purposes of computing the adjusted basis of a partner's interest

in a cash basis partnership, accrued but unpaid expenses and accounts payable are not liabilities

of the partnership or "partnership liabilities" within the meaning of section 752. Consequently, a

partner's tax basis in its partnership interest would not be increased by such expenses. Under

this Service-sanctioned definition of liability, the contingent interest obligation under the short

MLD position should not be viewed as a current liability and thus should not constitute debt for

federal income tax purposes. *Cf. Deputy v. du Pont,* 308 U.S. 488 (1940); Rev. Rul. 95-8, 1995-

4 I.R.B. 29.

        The Supreme Court in *Deputy v. du Pont* stated that, in terms of a short sale of

stock, "although an indebtedness is an obligation, an obligation is not necessarily an

'indebtedness.'" In that case, the taxpayer, Pierre du Pont, borrowed stock of E. I. du Pont de

Nemours and Company ("du Pont") under an agreement whereby he agreed to return the stock

loaned in kind within ten years and in the interim to pay to the lender all dividends declared and

paid on the shares so loaned. The taxpayer then sold the borrowed shares to certain executives of

du Pont for cash, which such executives borrowed from du Pont. These executives wanted a

financial interest in du Pont, but there were alleged legal prohibitions on the corporation itself

May 17, 2002
Page 52

selling the stock to them.  When the ten-year term of the loan was about to expire, the taxpayer

arranged for a new loan of securities from a different lender in order to satisfy his obligation to

the first lender.  The second loan of du Pont stock was similar to the first, in that it had a ten-year

term, the obligation was to return the stock loaned in kind, and in the interim pay an amount

equivalent to all dividends declared and paid on the borrowed shares, plus an amount equal to the

lender's tax liability arising by reason of the agreement.  The Service disallowed the deduction of

the amounts paid to the second lender on the grounds that the payment was not an ordinary and

necessary business expense of the taxpayer, nor was it deductible interest.  The disallowance was

reversed on appeal, but upheld by the Supreme Court.  On the first point, the Supreme Court held

against the taxpayer, finding that while the expenditures related to offering incentives to du

Pont's management may have been ordinary and necessary to du Pont's business, they were not

ordinary and necessary business expenditures of the taxpayer.  On the second point, the Supreme

Court also held against the taxpayer, finding that the payments relating to the security loan did

not constitute interest, because the obligation to return the du Pont shares was not an

"indebtedness," and the amounts paid did not constitute "interest," which was defined as

"compensation for the use or forbearance of money."  *Deputy v. du Pont*, 308 U.S. at 498.

Similarly, in Rev. Rul. 88-77, *supra*, as noted heretofore, the Service held that:

> For purposes of section 752 of the Code, the terms
> "liabilities of a partnership" and "partnership liabilities" include
> an obligation *only if and to the extent that* incurring the liability
> creates or increases the basis to the partnership of any of the
> partnership's assets (including cash attributable to borrowings),
> gives rise to an immediate deduction to the partnership, or, under
> section 705(a)(2)(B), currently decreases a partner's basis in the
> partner's partnership interest.  The preceding sentence uses the

### BRYAN CAVE LLP

> term "assets" to include capitalized items that are properly
> allocable to future periods, such as organizational expenses and
> construction period expenses. (emphasis added).

Thus, for purposes of section 752, if a liability does not exist, no section 752 adjustment should

be appropriate in connection with a partnership obligation that does not increase the basis of

partnership assets or generate either a deduction or a nondeductible, noncapital expenditure.

Further support for treating the short MLD position as a contingent interest

obligation, which is not a liability for purposes of section 752, is found in Rev. Rul. 73-301,

1973-2 C.B. 216. In this ruling, a partnership received cash progress payments on a construction

contract reported under the completed contract method. The partnership distributed the cash to

its partners. The issue was whether the partnership's obligation under the contract caused the

advance payments to constitute section 752 liabilities. If so, the cash distributions to the partners

would not have exceeded the basis of the partners' interests. The Service refused to accord

section 752 liability treatment to the construction contract, stating:

> The progress payments . . . received by the partnership and
> reflected as "deferred income" on the books of the partnership . . .
> represent amounts received on account of services performed on
> the contract not yet reported as gross income. This amount
> together with the right of the partnership to an additional
> payment . . . for work performed constitute "unrealized
> receivables" within the meaning of section 751(c) of the Code,
> and the progress payments are not a "liability" as referred to in
> section 752 which increases the adjusted basis of the partnership
> interests of the partners. The income or loss from performance of
> the contract will affect the basis of the partnership interest in the
> partners, as provided in section 705(a), when such income or loss
> is recognized for Federal income tax purposes.
>
> Accordingly, no increase in the adjusted basis of the
> partnership interests . . . is made as a result of the receipt by the

**BRYAN CAVE LLP**

> partnership of the advance payments within the meaning of
> section 752(a) of the Code.

Rev. Rul. 73-301, 1973-2 C.B. 216. Therefore, the Service disallowed a section 752 basis step-up, despite the resulting disparity between the inside basis of the partnership's assets and the outside basis of the partnership interests.

Similarly, in *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), the Tax Court held that a partnership's receipt of money pursuant to an option agreement did not create a partnership liability under section 752. *But see Salina Partnership LP v. Commissioner*, 80 T.C.M. (CCH) 686 (2000), discussed *supra*. In *Helmer*, a partnership owned certain real property on which it granted a corporation a purchase option. In consideration for the option, the corporation paid cash to the partnership. The partnership distributed the cash to its partners. The Service argued that the option agreement did not create a partnership liability under section 752, therefore the distribution of the option money caused the partners to recognize gain under section 731 (*i.e.*, the distribution of the option money exceeded the partners' tax bases in their partnership interests). The partners argued that the receipt of the option money created a short option partnership liability under section 752, which increased the adjusted basis of their respective partnership interests.

The Tax Court held for the Service, even though a disparity between partnership inside and outside basis resulted. The Tax Court stated:

> We are faced with a unique situation. Helmer Brothers
> received payments pursuant to the option agreement when there
> was no forfeiture of any of the option payments, the option had
> not been terminated, nor had any portion of the option been
> exercised by the optionee. Respondent, in his brief, conceded that

May 17, 2002
Page 55

> the income from the option payments was deferrable by the partnership until characterized as ordinary income (because of a default by the optionee) or capital gains (because of an exercise of the option by the optionee). . . .
>
>             . . . .
>
> . . . The moneys received under the option agreement were received without any restrictions except that upon exercise of the option such amounts would be applied against the purchase price. Thus, the restriction only affected the character of the gain in the partnership's hands. It is this lack of ability to determine character of income (not any liability to repay or to perform) that causes the deferral of the recognition of the income by the partnership until the option is either exercised or lapsed.

*Helmer*, 34 T.C.M. (CCH) at 731 (citations omitted). In contrast, in *Salina*, *supra*, the Tax Court

held a short sale of Treasury bills should be treated as a liability within the meaning of section

752. The Tax Court noted that "the term 'liability' is not defined in either the Code or the

Commissioner's final regulations under section 752." *Id.* at 700 (footnote omitted). Thus,

although the Tax Court concluded that the taxpayer entered into the Salina transaction to achieve

a valid business purpose independent of tax purposes, the Tax Court held:

> [T]hat Salina's obligation to close its short sale by replacing Treasury bills that it borrowed from Goldman Sachs and ABN represented a partnership liability within the meaning of section 752. In particular, as part and parcel of its short sale of the Treasury bills, Salina had a legally enforceable financial obligation to return the borrowed Treasury bills to Goldman Sachs and ABN.

*Id.*

The court in *Salina* appeared to be particularly persuaded that the short sale

transaction created a liability because of the legal requirement to return the borrowed Treasury

**BRYAN CAVE LLP**

bills. In the situation herein, in contrast to *Salina*, there was no legal obligation to make a

payment on the short MLD position unless the specified financial market measure was satisfied.

## I.    Nonapplication of Notice 2000-44

In Notice 2000-44, 2000-36 I.R.B. 255, the Service addressed several fact

patterns, including the following:

> [A] taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

> Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

> The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not

**BRYAN CAVE LLP**

allowable as deductions for federal income tax purposes.  The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations.  In particular, the transactions may be subject to challenge under § 752, or under § 1.701-2 or other anti-abuse rules.  In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2).  *See Fox v. Commissioner*, 82 T.C. 1001 (1984).  Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

We are of the view that Notice 2000-44 was intended by the Service to address

the purchase and sale of options and, therefore, likely should not be applicable to the purchase

and sale of the MLD long and short positions.  In this instance, unlike the fact patterns in Notice

2000-44, the actual positions in the MLDs — debt instruments with a contingent interest

component — are being purchased and sold.  Moreover, Notice 2000-44 provides little if any

technical analysis regarding the possible application of section 752 or other provisions of the

Code or Regulations to even the fact pattern set forth therein.  It is therefore impossible to

determine how section 752 should (if at all) be applicable to the MLDs in issue herein.

In Rev. Rul. 95-26, 1995-1 C.B. 131, the Service addressed whether a

partnership's short sale of securities creates a liability within the meaning of section 752.  In the

ruling, a partnership entered into a short sale of securities on a national securities exchange and

BRYAN CAVE LLP

the partnership's broker-dealer took securities on hand and sold them on behalf of the partnership. The partnership left the cash proceeds from the sale with the broker-dealer as collateral and deposited additional cash with the broker dealer as further collateral. The partnership was obligated to deliver identical securities to the broker-dealer to close out the short sale.

On these facts, the Service concluded that the short sale created a partnership liability within the meaning of section 752, and relied upon Rev. Rul. 88-77, *supra*, for the proposition that a liability under section 752 includes an obligation to the extent that incurring the liability creates or increases the basis to the partnership of any of the partnership's assets. The Service concluded that a short sale creates such a liability because (a) a short sale creates an obligation to return the borrowed securities, and (b) the partnership basis its assets is increased by the amount of the cash received on the sale of borrowed securities. *See also Salina Partnership LP v. Commissioner*, 80 T.C.M. (CCH) 686 (2000).

As noted above, these positions of the Service are distinguishable from the instant factual situation. Based on existing revenue rulings and case law, the conclusion reached in Notice 2000-44 should not be determined to be applicable to the Transactions.

As quoted above, Notice 2000-44 provides that the "transactions may be subject to challenge under section 752," but it does not provide any critical analysis on how section 752 should be applicable. The Notice concludes that the taxpayer would be incorrect in increasing its basis in its partnership interest by the cost of the call option while not reducing the basis as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call

**BRYAN CAVE LLP**

May 17, 2002
Page 59

option. Yet, the Notice fails to articulate how section 752 would reduce the basis since any decrease in a partner's individual liabilities by reason of assumption by the partnership of such liabilities (under section 752(b)) would be offset by an increase in its basis provided under section 752(a).[10] Under Treas. Reg. section 1.752-1(f), if as a result of the same transaction, a partner incurs both an increase in his share of the partnership liabilities and a decrease in his individual liability, the amounts are to be netted to determine whether he should be treated as having made a contribution or received a contribution. Consequently, even if these rules were applicable to the MLD contingent interest positions, the contribution by the Investor of the short MLD position to the LLC should have no current tax consequence.

Moreover, the Service has not revoked its long-standing position regarding the definition of liability espoused in Rev. Rul. 88-77 following its issuance of Notice 2000-44. The Notice is also inconsistent with the Tax Court's view that granting an option does not create a liability under section 752, as expressed in the *Helmer* case discussed above. It is reasonable to conclude, therefore, that unless the obligation at issue rises to the level of a liability (as per Rev. Rul. 88-77), no reduction in basis would be warranted.

## J.    Nonapplication of Section 358(h)

Section 358(h) provides, in relevant part, that if the basis of property transferred to a corporation in a section 351 exchange exceeds its fair market value, then the transferor's stock basis in the stock received must be reduced (but not below fair market value) by the

---

[10] Section 752(a) provides: "Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership."

May 17, 2002
Page 60

**BRYAN CAVE LLP**

amount (determined as of the date of the exchange) of any "liability" assumed in exchange for the property.

Section 309(c)(1) of H.R. 5662, contained in The Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763, directs the Service to prescribe "rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities [as defined in section 358(h)] in transactions involving partnerships." For this purpose, the term "liability" includes "any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of this title." Section 358(h)(3). This general rule <u>does not</u> apply to any liability if—

> (A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or

> (B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

Section 358(h)(2).

In this instance, the Investor has transferred to the LLC all of the assets which are associated with the short MLD position. Consequently, even if it were determined that the short MLD position meets this definition of "liability," the exception of section 358(h)(2) likely would apply and the general rule of section 358(h) likely would not.

**K.**     <u>Termination of the Long and Short MLD Positions</u>

Other than a basis adjustment for the net income, gain or loss recognized on the MLDs when they matured, the Investor should not have a negative basis adjustment pursuant to

**BRYAN CAVE LLP**

either sections 705 or 752(b). Section 705(a)(2)(B) provides, in part, that the adjusted basis of a partner's interest in a partnership shall be decreased by "expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account." This language should be viewed as applying to expenditures which deplete partnership assets but do not give rise to a deduction or basis. *See* McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners*, ¶ 6.02[3][c] (3d ed. 1997). Although the Regulations do not elaborate on the kinds of expenditures included in this category, typical examples of such expenditures are disallowed losses under sections 267(a)(1) or 707(b), life insurance premiums not deductible under section 264, and interest on debts incurred or continued in order to purchase tax-exempt notes not deductible under section 265. *See id.*; Willis, Pennell and Postlewaite, *Partnership Taxation*, ¶ 5.02[4] (6th ed. 1999).

When the MLDs matured, no additional payments were triggered with respect to the long and short positions. Consequently, no adjustment to the Investor's tax basis in the LLC should be required under section 705(a)(2)(B). Further, when the short MLD position matured such maturity did not result in any decrease in the liabilities of the partnership and thus would not result in a downward basis adjustment pursuant to section 752(b).

L.    **Liquidation of LLC**

Upon the liquidation of the LLC, section 731(a)(1) provides that gain is not recognized to a partner except to the extent that any money distributed exceeds the adjusted basis of the partner's interest in the partnership immediately before the distribution. Section 732(b) provides that the basis of property (other than money) distributed by a partnership to a partner in

**BRYAN CAVE LLP**

liquidation of the partner's interest will be an amount equal to the adjusted basis of the partner's interest in the partnership, reduced by any money distributed in the same transaction.  Section 735(b) provides that, in determining the period for which a partner has held property received in a distribution from the partnership, there shall be included the holding period of the partnership, as determined under section 1223, with respect to the property.

As result, pursuant to the above partnership liquidation rules, upon the liquidation of the LLC, the Investor would likely obtain an adjusted tax basis in the then remaining assets in the LLC received in the liquidation (*i.e.*, the Options) equal to the adjusted tax basis the Investor previously had in the Investor's LLC interest immediately before the distribution of the assets in the liquidation (reduced by the amount of cash received, if any).

### M.    Transfer of the Options to Margate LLC

Section 721 provides that no gain or loss will be recognized by a partnership or any of its partners on a contribution of property to the partnership in exchange for an interest in such partnership.  Under section 723, the basis of property contributed to a partnership by a partner will equal the contributing partner's adjusted basis in the property at the time of the contribution, increased by the amount of gain recognized (if any) to the contributing partner under section 721.  As a result, no gain or loss will be recognized by the Investor or Margate LLC upon the contribution of the Options by the Investor to Margate LLC in exchange for an interest in Margate LLC, and Margate LLC's basis in the Options should equal the Investor's basis in such Options at the time of the contribution.

**BRYAN CAVE LLP**

### N.      Sale of the Options by Margate LLC

Section 988 contains a complex set of rules prescribing the tax treatment of transactions in foreign currency, *i.e.*, a "section 988 transaction." The general rule of section 988(a)(1)(A) is that any foreign currency gain or loss on a "section 988 transaction" is ordinary income or loss. This rule applies notwithstanding any contrary provision providing for capital gain or loss. *See* Section 988(a)(1)(A); Treas. Reg. section 1.988-3(a).

A "section 988 transaction" includes, *inter alia,* (a) the disposition of nonfunctional currency, or (b) entering into or acquiring a forward contract, futures contract, option, warrant or similar financial instrument, if the taxpayer is entitled to receive, or is obligated to pay, an amount denominated in a nonfunctional currency. *See* section 988(c)(1); Treas. Reg. section 1.988-1(a). Since the U.S. dollar is the functional currency of both the Investor, the LLC and Margate LLC, any other currency is nonfunctional currency. Thus, the acquisition and disposition of the Options are "section 988 transactions."

In the case of a "section 988 transaction" described in section 988(b)(3) (generally a forward contract, futures contract, option or similar financial instrument where the underlying property to which the instrument or contract ultimately relates is a non-functional currency (*see* Treas. Reg. section 1.988-1(a)(iii))), any gain or loss from such transaction will be treated as a foreign currency gain or loss (as the case may be).

As a result, a sale of the Options by Margate LLC will likely result in ordinary gain or loss, measured by the difference between the amount realized on the sale and Margate

BRYAN CAVE LLP

LLC's adjusted tax basis of the Options (as determined above). To the extent a loss is

recognized by Margate LLC, that loss is allocable to the Investor pursuant to section 704(c).

## O.    Nonapplication of Section 6662 Penalties

### 1.    Substantial Understatement of Taxable Income

Section 6662(b)(2) provides for a 20 percent underpayment penalty for taxpayers

if there is a substantial understatement of income tax on a return. For non-corporate taxpayers,

an understatement is considered substantial for this purpose if it exceeds the greater of 10 percent

of the correct tax or $5,000. *See* section 6662(d)(1). An understatement generally does not

include deficiency amounts attributable to a position that is supported by "substantial authority"

or for which there is adequate disclosure. *See* section 6662(d)(2)(B).

Substantial authority for a position exists if the weight of authorities supporting

the position is substantial in relation to the weight of authorities against the position. *See* Treas.

Reg. section 1.6662-4(d)(3)(i). Authorities for this purpose include (but are not limited to)

applicable provisions of the Code; proposed, temporary and final regulations; revenue rulings

and revenue procedures; court cases; congressional intent as reflected in committee reports;

private letter rulings and technical advice memoranda issued after October 31, 1976; and actions

on decision and general counsel memoranda issued after March 12, 1981. *See* Treas. Reg.

section 1.6662-4(d)(3)(iii). The weight of an authority depends upon its relevance and

persuasiveness, and the type of document providing the authority. *See* Treas. Reg.

section 1.6662-4(d)(3)(ii).

BRYAN CAVE LLP

The "substantial authority" standard is higher than the "reasonable basis" standard but generally below "more likely than not." *See* Treas. Reg. section 1.6662-4(d)(2). The "reasonable basis" standard is defined in Treas. Reg. section 1.6662-3(b)(3) as a position that is significantly higher than not frivolous or not patently improper. The Internal Revenue Manual ("IRM") states that the standard is one where a position is arguable but fairly unlikely to prevail in court. The "more likely than not" standard is one where there is a greater than 50 percent likelihood that a position will be upheld if challenged by the Service. *See* Treas. Reg. section 1.6662-4(d)(2). The IRM therefore states that "the substantial authority exception can be met when the taxpayer has less than a 50 percent, but more than a one-in-three likelihood of being sustained on the issue." IRM 120.1.5.8.4.1 (1998).

If the position involves a tax shelter,[1] there must be both "substantial authority" for the position and the taxpayer must have "reasonably believed . . . that the tax treatment . . . was more likely than not the proper treatment." Treas. Reg. section 1.6662-4(g)(1). For purposes of our analysis, we have assumed that the Transactions would constitute a "tax shelter." The "reasonable belief" requirement can be satisfied if the taxpayer reasonably relies in good faith (*i.e.*, the taxpayer discloses all the facts it knows or should know) on the opinion of a qualified tax professional that unambiguously states that there is a greater than 50 percent likelihood that the tax treatment will be upheld if challenged by the Service. *See* Treas. Reg. section 1.6662-4(g)(4).

---

[1]  A "tax shelter" is generally defined as any plan or arrangement a significant principal purpose of which is the avoidance or evasion of federal income tax. *See* section 6662(d)(2)(C)(iii).

May 17, 2002
Page 66

## 2.   Substantial Valuation Misstatement

Section 6662(b)(3) provides for a 20 percent underpayment penalty for taxpayers if there is a substantial valuation misstatement under chapter 1 of the Code. Section 6662(e)(1)(A) provides that there is a substantial valuation misstatement under chapter 1 if, among other things, the value or adjusted basis of any property claimed on any income tax return is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis.  Section 6662(h)(1) increases the penalty to 40 percent in the case of any gross valuation misstatement.  Section 6662(h)(2) provides that there is a gross valuation misstatement if, among other things, the valuation or adjusted basis of any property claimed on any income tax return is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis.  The penalty does not apply, however, if the reasonable cause exception of section 6664(c) and Treas. Reg. section 1.6664-4, discussed below, applies.

Because the tax basis of the long MLD position is more than 400 percent of the net cost of both MLD positions, the terms of section 6662(h)(2) might appear to apply, absent the section 6664(c) reasonable cause exception.  However, the legislative history of section 6662(e) implies that the provision is intended to apply only where excessive basis arises as a result of an excessive valuation, *i.e.*, an issue of fact, as opposed to an issue of law.

The gross valuation misstatement penalty is an extension of the 20 percent penalty under section 6662(e) for a "substantial valuation misstatement," which exists if the value or adjusted basis claimed on the return is 200 percent or more of the correct amount.  A dispute with the Service regarding the basis of an asset can arise either from an issue of fact or from an

BRYAN CAVE LLP

issue of law.  In Joint Committee on Taxation, *General Explanation of the Economic Recovery Tax Act of 1981* (JCS-71-81), December 29, 1981 [hereinafter "1981 Tax Act Explanation"], a discussion of the reasons for the new penalty made clear that Congress was concerned only with basis overstatement resulting from excessive valuations, not incorrect application or interpretation of law.  It stated:

> The Congress believed that a specific penalty was needed to deal with various problems related to the valuation of property.  This particular need is illustrated by the fact that there are about 500,000 tax disputes outstanding which involve property valuation questions of more than routine significance.  These cases alone involve approximately $2.5 billion in tax attributable to the valuation issues.

> The Congress recognizes that valuation issues frequently involve difficult questions of fact.  Often these issues seem to be resolved simply by "dividing the difference" in the values asserted by the Internal Revenue Service and those claimed by the taxpayer.  Because of this approach to valuation questions, the Congress believes that taxpayers were encouraged to overvalue certain types of property and to delay resolution of the valuation issues. . .
> .

> In recognition of the fact that valuation issues often are difficult, especially where unique property is concerned, the Congress decided to adopt a test for the application of a new penalty under which only significant overvaluations will be penalized.

1981 Tax Act Explanation.

The Joint Committee provided two examples of the situations that the provision was intended to address.  Neither example involved a disputed tax-free reorganization, section 351 exchange, or like-kind exchanges, common situations resulting in legal disputes over the adjusted basis of property.  Instead, one example involved an excessive valuation in the context of a charitable deduction and the other involved a basis adjustment arising from an

May 17, 2002
Page 68

excessive estate tax valuation. At no point did the 1981 Tax Act Explanation by the Joint Committee refer to basis adjustments arising from disputes over matters of law.

Furthermore, the amendments made in 1989 suggest, by implication, that no change in this view was intended. Thus, a separate penalty provision, section 6662(e)(1)(B), was enacted to deal with valuation and basis adjustments arising from adjustments under section 482, which involves both issues of fact and issues of law.

Based upon the foregoing, a fair reading of the statute and its legislative history strongly suggests that a basis overstatement arising from issues of law, such as the Transactions, should not be the type of overstatement intended to be reached by section 6662(e)(1)(A).

### 3. **Reasonable Cause**

Section 6664(c) provides a general exception to section 6662 penalties in the case of a position taken with reasonable cause and in good faith (the "reasonable cause exception"). Whether a taxpayer has "reasonable cause" and "good faith" is a facts and circumstances determination made on a case-by-case basis. The most important factor is the extent of the taxpayer's effort to determine proper tax liability. *See* Treas. Reg. section 1.6664-4(b)(1). Reliance on the opinion of a professional tax advisor constitutes "reasonable cause" and "good faith" if the advice is based on all pertinent facts and circumstances and the law as it relates to those facts and circumstances. For example, relevant facts include the taxpayer's purpose for entering into a transaction and for structuring the transaction in a particular manner. All facts that are relevant to the tax treatment of a transaction must be disclosed. *See* Treas. Reg. section 1.6664-4(c)(1)(i).

BRYAN CAVE LLP

The Regulations also set forth the following requirements ("General Opinion Requirements"), all of which must be satisfied for reliance on tax advice, including opinion letters, to be considered reasonable and in good faith:

(i)   The opinion was based on all pertinent facts and circumstances, including the taxpayer's purposes (and the relative weight of such purposes) for entering into the transaction and for structuring the transaction in a particular manner. In addition, reliance on an opinion will not be considered reasonable if the taxpayer fails to disclose a fact that it knows or should know to be relevant to the proper tax treatment of an item.

(ii)  The opinion was based on the law as it relates to those facts and circumstances.

(iii) The opinion was not based on any unreasonable factual or legal assumptions (including assumptions as to future events).

(iv)  The opinion did not unreasonably rely upon the representations, statements, findings or agreements of the taxpayer or any other person. For example, the opinion must not be based upon a representation or assumption that the taxpayer knows or has reason to know is unlikely to be true.

See Treas. Reg. section 1.6664-4(c)(1).

Although we have found no court case that has construed the General Opinion Requirements (which were issued in August of 1995; T.D. 8617), numerous judicial decisions have relied upon similar principles in holding that a taxpayer's reliance upon the advice of a tax professional qualified for the reasonable cause and good faith exception to the substantial understatement penalty. See, e.g., Mauerman v. Comm'r, 22 F.3d 1001 (10th Cir. 1994); Vorsheck v. Comm'r, 933 F.2d 757 (9th Cir. 1991); Heasley v. Comm'r, 902 F.2d 380 (5th Cir. 1990); Daoust v. Comm'r, 67 T.C.M. (CCH) 2914 (1994); English v. Comm'r, 65 T.C.M. (CCH) 2160 (1993).

May 17, 2002
Page 70

The Supreme Court also reaffirmed the right of a taxpayer to rely upon the substantive advice of the taxpayer's accountant or attorney to avoid penalties in *United States v. Boyle*, 469 U.S. 241 (1985) (which distinguished between reasonable reliance on professionals to avoid filing deadlines, which did not constitute "reasonable cause," and reasonable reliance on professionals as to questions of substantive law, which would). According to *Boyle*:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.

*Id.* at 251.

In a number of cases, courts have not permitted a tax shelter investor to rely on an opinion of counsel — even one stating that it was "more likely than not" that the tax benefits would be respected — as a shield from penalties. *See, e.g., Robertson v. Comm'r*, 77 T.C.M. (CCH) 1849 (1999); *McCrary v. Comm'r*, 92 T.C. 827 (1989). The opinions in these cases generally were not directed to the specific investor, but were a part of, or attached as an exhibit to, the offering materials, and based on factual assumptions, such as appraisals, which were at the very least open to question. *See, e.g., Charlton v. Comm'r*, 60 T.C.M. (CCH) 324 (1990) (the opinion was "replete with cautions and waivers"). Further, in *Barber v. Commissioner*, T.C. Memo. 2000-372, where the investor secured, and claimed to have relied on, the "more likely than not" opinion of independent counsel, the advisor himself had no knowledge of the industry on which the tax shelter was based, relied on an obviously unreasonable appraisal, and applied so

**BRYAN CAVE LLP**

many caveats to the opinion that the taxpayer should have realized it was worthless. By contrast, the opinion here is not part of any offering materials, is rendered directly to the Investor, and does not rely on any controversial factual assumptions.

Furthermore, as discussed above, the substantial understatement penalty should not apply merely because the tax reasons for a transaction are found to outweigh the business reasons. In enacting the substantial understatement penalty, Congress acknowledged that "no reasonably informed business decision is made without regard to its tax effects." A "tax shelter" is defined as an arrangement in which "the" principal purpose is to avoid or evade tax. Such a strict reading of the penalty would therefore eliminate the reasonable cause and good faith exception to the penalty for all corporate and non-corporate taxpayers participating in such transactions. It is clear from the legislative history that Congress intended to preserve, not eliminate, this exception for all taxpayers. Unlike the cases where a penalty was sustained despite advice of counsel, the Transactions do not rely on unreasonable financial assumptions. Based on the Investor's signed representations, the Investor had a profit motive for entering into the Transactions, and there existed an objective ability to make an economic profit. Accordingly, the substantial understatement penalty should not apply to the Investor.[12]

---

[12] In a recent tax shelter case in which the court sustained substantial understatement penalties, the taxpayer had not secured a "more likely than not" opinion from counsel. *See I.R.S. v. CM Holdings, Inc.*, 86 AFTR 2d 2000-6470 (D. Del.).

BRYAN CAVE LLP

## III.  **OPINIONS**

Based on the above discussion and analysis, and subject to the qualifications, limitations and assumptions set forth herein, we are of the opinion that under current federal income tax law it is more likely than not that:

A.  The MLDs should be treated as debt instruments for U.S. federal income tax purposes with a contingent interest component that would not be includable in income under section 1275 until the contingency is satisfied.

B.  The contingent interest obligation under the short MLD position should not be a liability within the meaning of section 752.

C.  The Investor's tax basis in the interest in the LLC should be equal to the cash contributed plus the purchase price for the long MLD position, without adjustment resulting from the contribution of the short MLD position.

D.  The maturity of the short MLD position should not result in a deemed distribution to the Investor for U.S. federal income tax purposes and the provisions of section 705(a)(2)(B) should not apply; consequently, there should be no adjustment to the Investor's adjusted basis in the LLC as a result of the maturity of the MLDs.

E.  As a result of the liquidation of the LLC, the Investor will take a tax basis in the Investor's share of the LLC's remaining assets (*i.e.*, the Options) equal to the tax basis previously held in the Investor's LLC interest, reduced by the cash received, if any.

F.  A sale of the Options by Margate LLC will likely result in ordinary gain or loss, measured by the difference between the amount realized on the sale and Margate LLC's adjusted tax basis of the Options, and to the extent a loss resulted from the sale of the Options by Margate LLC, such loss is allocable to the Investor pursuant to section 704(c).

G.  Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions should be upheld if challenged by the Service.

H.  Based upon the foregoing, the Service should not be successful were it to assert a penalty against the Investor under section 6662(b)(2) or (3) for

May 17, 2002
Page 73

positions taken on the Investor's federal S corporation income tax return with respect to the Transactions.

The opinions set forth above are subject to the following qualifications, limitations and exceptions: no opinion is expressed regarding the tax treatment of the described Transactions for the purpose of any state and local income tax, or any tax other than the U.S. federal income tax. Any misstatement of a material fact or omission of any fact that may be material or any change in any of the facts referred to may require a modification of all or part of the above opinions.

Our opinions are limited to matters expressly set forth herein, and no conclusion may be applied or inferred beyond the matters so stated. The opinions expressed herein are based upon our interpretation of current law. The opinions expressed herein are not binding on the Service or the courts, and there can be no assurance that the Service and the courts will not take a position contrary to the opinions expressed herein. We do not undertake to advise you of any changes in law which may occur after the date hereof. The Code, the Regulations promulgated thereunder, and the administrative position of the Service are subject to change either prospectively or retroactively. Such changes could render certain or all of the opinions expressed herein inapplicable.

A number of issues raised by the matters addressed in this letter are complex and have not been definitively resolved by the tax laws. The opinions that we have reached herein are based upon our interpretation of existing law and our belief regarding what a court would more likely than not conclude if presented with the relevant issues properly framed. However,

**BRYAN CAVE LLP**

we cannot assure that our interpretations will prevail if the issues become the subject of judicial

or administrative proceedings.

The opinions expressed herein are furnished by us solely for your benefit, and

thus may not be relied upon or delivered to any person without our express, prior written

approval.

Very truly yours,

*Bryan Cave LLP*

Bryan Cave LLP